The People v. The Albany and Susquehanna Railroad Company.

THE PEOPLE OF THE STATE OF NEW YORK v. THE ALBANY AND SUSQUEHANNA RAILROAD COMPANY.

(MONROE COUNTY CIRCUIT AND SPECIAL TERM, ROCHESTER, NOV., 1869.)

Issues of fact in the civil actions substituted for the writ of *quo warranto*, and proceedings by information in the nature of *quo warranto*, are not, under the Code, triable, as of course, by a jury. When, in such action, the complaint and the nature of the case call for equitable relief, the cause regularly comes on for trial by the court. And, although on timely application, the question of title to the office might be tried before a jury, a demand for a jury, made after the parties and witnesses are present, prepared for the trial, and plaintiff has opened the case, read the pleadings and rested, may be refused.

Since the amendment, in 1854, to the general railroad law, which provides (§ 5), " that at every election of directors, the books and papers of such company shall be exhibited to the meeting, if a majority of the stockholders present shall require it," a party challenging votes is not entitled to a production of the books, although a prior by-law of the company authorizes him to demand it.

If such by-law were in full force, it would only be directory, and the omission to comply with it, and the disregard of the challenge, would not invalidate an otherwise valid election; but would cast on the parties claiming under it, the burden of showing that the voters so challenged were, or appeared by the transfer books when closed, to be actually shareholders in the company for the number of shares so voted.

It being provided by the by-laws, and stated in the notice of the annual meeting for the election of directors, that the polls would be opened at twelve, and continue open until one o'clock, the fact that the poll was not open until after twelve o'clock, and continued open until after one o'clock, does not invalidate the election.

A person who is not a stockholder, is sufficiently authorized to call a meeting of stockholders to order when he holds a proxy, and is requested by

The People *v.* The Albany and Susquehanna Railroad Company.

the president to call the meeting to order, and act for him, and such call is recognized by the stockholders present.

Surprise and fraud upon a part of the electors is ground for avoiding an election, and all acts done by portions of the corporators, which bear the appearance of trick, secrecy, or fraud, will be held invalid.

Accordingly, if a portion of the stockholders meet and organize before the hour named in the by-laws, and notice for the annual meeting, and afterward when the hour actually arrives, without any actual change in the organization, pass resolutions previously prepared, that the meeting proceed with the election of directors, with the same chairman and secretary, and also that the annual election of directors and inspectors proceed, with the inspectors first chosen, the organization of the first meeting is obviously a surprise and fraud upon many of the stockholders entitled to attend and take part in it; and the reorganized meeting in fact and· in legal effect, but a continuance of the first meeting, and irregular and void as against such stockholders as do not participate in it; and such meeting as to its effect on the validity of another meeting duly organized soon after the proper hour, must be regarded in law as if it had never been held.

The *ex parte* appointment in a certain action of a receiver, who obtained possession of certain scrip and voted on it, and the *ex parte* appointment in another action, of interested parties as receivers of the books and papers and property of· a railroad,—*Held*, evidence that the suits were instituted and the orders applied for with a fraudulent design to aid the election of a certain set of directors. ·

The practice in relation to the appointment of receivers *ex parte* reviewed

The service on inspectors of election, chosen at the last annual meeting, of an injunction restraining them from acting, and the service of an order of arrest, on the president of a railroad company within half an hour of the time fixed for the annual meeting,—*Held*, under the circumstances, an obvious and designed surprise upon the great body of stockholders of the corporation, and intended to hinder and embarrass them.

The pre-occupation of the directors' room, before the hour fixed for an election, by a large number of persons specially imported for the purpose and furnished with proxies, that they might participate in the stockholders' meeting and in the election,—*Held*, a gross perversion and abuse of the right to vote by proxy, and a clear infringement of the rights of *bona fide* stockholders.

It seems that an election held in distinct violation of a valid injunction duly served, would be set aside on a summary application to the court, pursuant to § 5, title 4, chap. 8, first part of the Revised Statutes.

There can be no such thing as an officer *de facto*, as against the people, in an action by them to try the title to the office. The doctrine in respect to officers *de facto* only applies to, and in favor of third persons, and to protect innocent parties who trust to the apparent title to an office.

The choice of a certain set of directors, procured through a preconceived

scheme, combination or conspiracy, to carry their election by the use and abuse of legal process and proceedings, and by efforts and contrivances to prevent a fair election of inspectors, adjudged invalid; and another set of directors, chosen at another meeting of the stockholders, held at the same time and place, held to be duly elected,

Judgment ordered, at the suit of the people vacating certain receiverships, perpetually restraining proceedings in certain suits affecting the officers, books, stock and property of the corporation, and ordering such suits to be discontinued without costs.

THIS was an action brought by the attorney-general upon his own information, in pursuance of § 432 of the Code.

The complaint stated that the Albany and Susquehanna Railroad Company was a corporation created by and existing under the laws of the State of New York, organized for the purpose of constructing, maintaining and operating a railroad under the general laws of this State; that they owned and operated a railroad from Albany to Binghamton, in this State; that the stockholders of said company were divided into two parties, each claiming to hold a majority of the stock of said company, and each claiming that they were rightfully entitled to a majority of the legal votes cast at an election of directors of said company, which was held in the city of Albany, on the 7th day of September, 1869; that these differences led, prior to said 7th day of September, to a series of litigations, and gave rise to a number of actions. One of these actions was brought in the Supreme Court of the first judicial district, by Joseph Bush, against said company and others, for the cancellation of certain stock, and an injunction was granted therein against the conversion of bonds into stock, and a receiver of said stock was appointed. Another suit was brought in said court, in the county of Otsego, by the town of Oneonta, wherein an injunction was issued against the commissioners of said town, from voting on certain stock. Another suit was brought in said court, in the first judicial district, by David Wilbur, plaintiff, against said company and others, wherein an injunction was issued. Another action was brought in said court and district, by said Wilbur, against said company and others, in which an injunc-

The People *v.* The Albany and Susquehanna Railroad Company.

tion was issued. Another action was brought in said court and district, by Azro Chase, wherein the defendants, James Fisk, Jr., and Charles Courter, were appointed receivers of said road; and the said receivers gave bonds and took, or claimed to take possession of said railroad. Another action was brought, in the name of said railroad company, in the county of Albany, against Jacob Leonard and others, wherein an injunction was granted; and another action was brought in said court, wherein John W. Van Valkenburgh was plaintiff, and the said company was defendant, wherein Robert H. Pruyn was appointed receiver of said company; and he filed his bonds, and took, or claimed to take possession of said road. Another action was brought in said court and county, wherein the said road was named as plaintiff, and the directors and both receivers were named as defendants, wherein an injunction was granted. Another action was brought by said Pruyn, in the county of Albany, against the sheriffs of different counties, wherein an injunction was issued; that another action was brought by Jay Gould against said company, and that various proceedings for contempt, in violating injunctions, on both sides, had been instituted. All such proceedings were pending and undetermined, and various other suits between the contending parties were in progress, or threatened. And that the controversies arising out of such actions and litigations, had given rise to conflict of authority between public officers in attempts to execute conflicting processes from different judicial officers, to such an extent as seriously to threaten the public peace along the line of said company's railroad; that such controversies were temporarily quieted by an agreement between the contending parties, of which the following is a copy:

"ALBANY, *August* 11, 1869.

" *To the Governor of the State of New York:*

"By virtue of certain judicial proceedings, and conflicts of jurisdiction and collisions, it has become, and is impracticable to operate and run the Albany and Susquehanna railroad, either under the management of the directors, or the control

of the persons claiming to be receivers.   The public interests, and the obligations of the company, demand that the road should be run and operated, and the undersigned, as contend‑ ing claimants to the possession of the road, hereby request you to appoint some suitable person or persons to act as super‑ intendent, and to run and operate the road, under your directions, and during your pleasure, or until the necessity of such superintendence shall cease ; said appointment, and the possession by yourself, and the person or persons to be appointed, not to affect the legal rights, or the present actual possession of the parties, respectively, to any part of said road, or the officers or property thereof.   It is understood, that you are to employ such agencies, financial or otherwise, as you may require, and to fix the compensation of all persons employed by you."

That in pursuance of this request, the governor appointed Robert L. Banks executive and financial agent, to run and operate said road, and that the said Banks entered upon the discharge of said trust, and has since continued to have the charge and management of the same.

That on the 7th of September, then instant, the day fixed for the annual election for directors for said company, each of said contending parties, holding or pretending to hold an election, separate and apart from the others, elected a separate board of directors.   One of said parties elected, or pretended to elect, J. Pierpont Morgan, and twelve other persons, named and made defendants in this suit, and the others, of said contending parties, elected, or pretended to elect, as directors of said company, Charles Courter, and twelve other persons, named as defendants in this suit.

The plaintiff further alleged, on information and belief, that both of said elections were illegal, irregular and void ; that the inspectors of each side were appointed in a manner not authorized by law, or by the by-laws of said company ; that stock was voted on, and by persons not authorized to cast a vote thereon ; that the inspectors, on both sides, were restrained by injunctions, while the election was going on,

from acting according to their own judgment; that the transfer books were not present, and were not produced, although demanded by several stockholders; that several towns, along the line of said road, were owners of the stock of said company, and that three or more of such towns were represented at said election by rival commissioners, and votes on such stock were cast on each side.

That Joseph H. Ramsey had given notice of the presentment of a petition to the Supreme Court for the removal of the last named board of directors, and for the confirmation of the election of the first named board of directors; that another action had been brought in the name of Eli Perry, as plaintiff, to restrain the last above named board of directors, Charles Courter, and his associates, from acting as directors; that five other suits had been brought in relation to the said matters referred to, in one of which, the defendants Groesbeck, Chamberlain, Morrell, Boyd, Vincent and Falls were plaintiffs; in another, the said company and J. H. Ramsey were named as plaintiffs; in another, John W. Van Valkenburg; in another, Minard Harder, and in another, John Eddy as plaintiffs.

That plaintiffs were informed that the last named board threatened, and intended to bring suits, to compel the delivery to them of the property of the company, and to secure the recognition of their claims as directors of said company.

The plaintiff further alleged that each of said pretended boards of directors threatened, and intended to take, or claimed to have possession of said railroad, and all the property, books and papers belonging to said company, and to exercise all the franchises, privileges and corporate rights granted to said corporation, and the plaintiffs alleged and insisted that such claims were without foundation in right, and if such threats were carried into execution by either of said contending boards of directors, it would be a usurpation of the franchises and corporate rights of said corporation, and would lead to a conflict of judicial authority, and to a breach of the peace, and the good order of the community. The plaintiff further

alleged, upon information and belief that large amounts of the stock of said company, and other property of said company, had been alienated and transferred by the officers of said company, contrary to law, and foreign to the business of said company, and particularly to a number of persons therein named.

The plaintiffs further stated that the governor was desirous of being relieved, and of relieving those appointed by him in the management of said railroad, from the positions occupied, and the responsibility borne by them under the agreement aforesaid; that the governor could not determine, without danger of doing injustice to one of the parties, whether either of said boards, and if either, which of them, was lawfully entitled to the possession and management of said road, and of the company's affairs; that the decision of the governor, if made, would not have the force of a judicial determination, and might result in injury to the corporation.

That the governor had, therefore, requested that this action be brought, in order that the said railroad might be placed under the direction and control of competent judicial authority, independent of both contending parties, until the rights of the respective parties to the said controversy, could be judicially determined. The complaint prayed for an injunction against the defendants composing the two boards of directors, restraining them from taking possession of, or in any manner interfering with the said railroad, or any of its property, books and papers, and from exercising the franchise, privilege or corporate rights of said corporation, and from acting as directors or officers of said corporation: also, that it be adjudged whether either of the said elections were regular and legal, and if either, which of them; that if neither of said boards be declared duly elected and entitled to hold office under said elections, that both classes of said defendants be removed from office, and a new election ordered by the court. Also, that the defendants be restrained from prosecuting any of the suits heretofore brought, as above stated, and from commencing any new suits or proceedings in rela-

tion to said controversy, and that they be restrained from holding any other election of directors of said company. Also, that receivers Pruyn, Courter and Fisk be restrained from taking possession of said railroad, or in any way or manner interfering with the same, and that a receiver be appointed to take possession of the road.

The defendants composing the board of directors, embracing Walter S. Church, Charles Courter, James Fisk, Jr., and others, answered the complaint, and set up that they were, in all respects, lawfully elected directors of said company, at the time and place mentioned in said complaint, and claimed that said election was fairly and lawfully conducted, so far as related to their own election, and denied the validity of the election, of the other board, headed by J. Pierpont Morgan, and denied that such election was held by legal inspectors, and alleged that such inspectors did not take their places, or receive votes, or act as inspectors, until more than twenty minutes after the regular inspectors had commenced to act, and more than twenty minutes after the time fixed by the by-laws of said company for opening the polls, and in effect admitted otherwise, the general allegations of the complainant, and demanded judgment, that the election of these said defendants as directors of said corporation, be declared and adjudged regular and valid, and that the said defendants, Walter S. Church, Charles Courter and their associates, be put in possession of the property and franchises of said corporation, and an injunction issued, as asked for in the complaint, against the said Morgan and others, claiming to act as directors of said corporation, as against the said defendants.

The defendants, J. Pierpont Morgan, Robert H. Pruyn and others comprising the other board of directors, in like manner answered the complaint, asserting the legality of their elections, and denying the legality of the election of the said board headed by Walter S. Church, Courter and others; and denied that James Fisk, Jr., and Charles Courter were lawfully appointed receivers, and insisted that such appointment was illegal and void, and alleged that a receiver of said road

had been previously duly appointed, and was in possession of said road at the time of such appointment; and alleged that the pretended order appointing Fisk and Courter receivers, and all other orders and injunctions, including said order appointing said receivers, were obtained by false and fraudulent misrepresentation and suppression of the truth, and in aid of a conspiracy against the interests of said railroad and the stockholders thereof, and in order to get the possession, control and management of said road away from the stockholders of said company, to the end that it might be managed and controlled in the interest and for the benefit of Jay Gould, James Fisk, Jr., and others acting with them; and otherwise, in effect, admitted the general allegations of the complaint, attesting that all that had been done by them, or others acting with them, had been lawful and fair, and properly done for the best interest of said corporation, and demanded judgment that said directors, J. Pierpont Morgan, and his twelve associates, might be adjudged and declared duly and legally elected, and rightful directors of said company, and, as such, entitled to the possession of its property, and to the exercise of the rights and franchises thereof; and that the election of the said Charles Courter, James Fisk, Jr., and others, be declared illegal and void; and that the stock, whose validity was questioned in the complaint, be established, and that an injunction issue, as asked for in the complaint, against the said Charles Courter, and others, restraining them from interfering with the property of said corporation. Two answers were put in, nominally, by the railroad company, by different attorneys; each claims to represent the corporation, &c., said answers concurring, in substance, with the answers of the said respective board of directors, as above stated.

Answers were also put in by the other defendants, Dabney, J. P. Morgan, Goodwin, George H. Morgan, Bush, Groesbeck, Chamberlain, Vincent, Morrell, Falls, Boyd, Sloan, Thompson and Green, denying the allegations of the complaint in respect to such parties, so far as such allegations questioned the validity of the stock held by them respectively; and asserting the

validity of such stock, and of their title to the same; and therein admitting the general allegations of the complaint.

The issues thus formed came on for trial at an adjourned Special Term and Circuit, held at Rochester on the 29th day of November, 1869, when,

*Marshall B. Champlain,* attorney-general, *George G. Munger* and *Stephen H. Hammond,* assistant attorney-general, appeared for the people.

*William F. Allen, Charles Tracy, Aaron J. Vanderpool, Henry Smith, Matthew Hale* and *John H. McFarland* appeared as counsel for Joseph H. Ramsay, J. Pierpont Morgan and other defendants.

*David Dudley Field, John H. Martindale, William C. Barrett* and *Dudley Field* appeared for James Fisk, Jr., Jay Gould, Charles Courter, Walter S. Church, and defendants of the same class of directors.

By the Court—E. DARWIN SMITH, J.  Upon the issues presented in the pleadings, and the mass of evidence taken upon this trial, the first question presented for my decision relates to the power of the court in equity to give the relief demanded in the complaint.

The mode of determining the title of a party to an office, prior to the Code, was by *quo warranto,* or by information in the nature of a *quo warranto;* and these proceedings could only be instituted and prosecuted to effect in the courts of law.

Section 428 of the Code declares that the writ of *scire facias,* the writ of *quo warranto,* and proceedings by information in the nature of *quo warranto* are abolished, and that the remedies heretofore obtainable in those forms may be obtained by civil actions, under the provisions of that chapter.

Section 432 of the same chapter provides that an action may be brought by the attorney-general, in the name of the people, upon his own information, or upon the complaint of any private parties, against the parties offending: "Where any

person shall usurp, intrude into, or unlawfully hold or exercise any public office, civil or military, or any franchise within this State, or any office in a corporation created by the authority of this State;" and § 440 of the same chapter is as follows: "Where several persons claim to be entitled to the same office or franchise, one action may be brought against all such persons in order to try their respective rights to such office or franchise." These sections of the Code clearly authorize the institution of this action, in the name of the people. Such action must be commenced and prosecuted like other civil actions, and is to be governed, in respect to the pleadings and proceedings by the same rules. (*The People* v. *Cook*, 4 Seld., 67; *The same* v. *Clarke*, 11 Barb., 337; *The same* v. *Ryder*, 2 Kern., 433.) The Code, § 142, requires that the complaint in all actions shall contain a plain and concise statement of the facts constituting the cause of action. The complaint in this case conforms to this rule, and asks appropriate relief. The relief demanded consists in, and the nature of the case requires, the exercise of the equitable power of the court. In conformity with the prayer of the complaint, an injunction has been issued and a receiver has been appointed, which are the usual and appropriate instrumentalities of a court of equity. The action is therefore properly brought. The subject-matter of the controversy is clearly within the jurisdiction of the court, and the only point of any practical consequence in this connection relates to the mode of trial. Issues of fact upon *quo warranto*, issues of fact upon the relation of a party claiming an office, upon information, when the party proceeded against was in the possession of the office, before the Code and usually since, have been tried by a jury upon the issues made by the pleadings. The chapter of the Code in respect to actions in place of *scire facias, quo warranto*, and of informations in the nature of *quo warranto*, has been enacted and incorporated into the Code since its original enactment in 1848, and no express provisions are made in said chapter, or elsewhere, that I have been able to find, providing for the trial of such actions. Section 253 of the Code provides that issues of fact in actions for

The People *v.* The Albany and Susquehanna Railroad Company.

the recovery of money only, or of specific real or personal property, or for a divorce from the marriage contract on the ground of adultery, must be tried by a jury, unless a jury is waived and § 254 provides that every other issue is triable by the court, which may, however, order the whole issue, or any specific question of fact involved therein, to be tried by a jury.

The issues of fact, therefore, formed in this action, were in the first instance and are triable, by the court, but the two most important and leading issues might have been submitted to a jury; and if an application had in due time been made for that purpose, it would most probably have been granted, and the court thus have been relieved of the unpleasant burden and responsibility of passing upon the facts of the case. But no application or suggestion of that kind was made to the court until the cause had proceeded to trial, and the attorney-general had opened the case, read the pleadings, and rested; when the parties and counsel being on both sides present, and not unprepared for trial, and a large number of witnesses also being in attendance, I held that the application came too late, and that the trial must proceed. It remains, therefore, for me to pass upon the issues made by the pleadings, as with other cases tried by the court.

Before proceeding to discuss the evidence applicable to the leading issues in the action, I will state such preliminary facts as I deem fully established by the evidence, and undisputed.

The Albany and Susquehanna railroad is a corporation organized in 1851, under the general railroad act of 1850, with a capital, originally, of $1,400,000, divided into 14,000 shares of $100 each, and subsequently increased, by special act of the legislature, to $4,000,000; and entitled, under the fifth section of the general act, to thirteen directors, to be chosen annually by a majority of the votes of the stockholders voting at such election, in such manner as may be prescribed in the by-laws of the corporation.

The by-laws provide that the annual election of directors should be held on the first Tuesday of September, 1852, and

on the same day in each year thereafter, at such place as might be prescribed by a resolution of the directors the preceding year; the polls to be open at twelve o'clock at noon, and to continue open until one o'clock in the afternoon; that no transfer of stock should be made for thirty days next previous to the annual election of directors, and on the day of election the secretary should present to the inspectors of election, the transfer books, and an alphabetical list of the names of stockholders entitled to vote at such elections, and the number of shares held by each; and that at the election in 1852, and at each succeeding election, three persons, who are stockholders, shall be chosen by the persons entitled to vote for directors, as inspectors of the next succeeding election. It was also duly proved that a public notice of the holding of the annual election for thirteen directors of said corporation was duly published for more than thirty days before said election, the first publication being on the 3d day of August, 1869; and that said notice stated that such election would be held at the office of the company, No. 262, Broadway, in the city of Albany, on Tuesday, the 7th day of September, 1869; that the poll would open at twelve o'clock, noon, and continue open for one hour thereafter, and that the transfer books would be closed on the 7th day of August, and reopened on the 8th day of September.

At the stockholders' meeting, convened in pursuance to this notice, it also appears that the inspectors of election chosen at the annual election in 1868, to conduct the election for 1869, did not qualify and act, having been restrained from so doing by injunction; and that as the proper resource of the stockholders in that exigency, both classes of stockholders desiring to contest such election, proceeded to choose inspectors for such election. It is not disputed that such was the right of the stockholders so appearing. (*Vide Matter of Wheeler*, 2 Abbott Rep. N. S., 361.)

Upon the evidence on the merits, it appears that on the day and at the place fixed for such election, the stockholders of said railroad company appeared in large numbers, and chose

two sets of inspectors, and held two independent elections in the same room, both proceeding at the same time ; and that, in proper form, each set of inspectors certified to the election of a board of thirteen directors at each poll, one class of whom I will call, for greater distinction, the Ramsey board, headed by J. Pierpont Morgan ; and one the Fisk board, headed by Charles Courter and Walter S. Church ; that each of these classes of men organized after such election as a board of directors of said corporation, and claimed to be lawfully elected, and to possess the right to exercise and control the franchises and property of said corporation.

The chief issues for my decision arise upon these facts, and the evidence relates to these conflicting claims, and I will proceed to discuss them in the order in which they were tried.

First: Was the election of the board called the Ramsey board of directors valid and legal, or otherwise?

The evidence I think clearly establishes that the inspectors, Snow, Eddy and Harder, who held this election, were chosen at a meeting of the stockholders, held in the hall of the company's office or building, organized soon, and I think from ten to fifteen minutes after 12 o'clock at noon ; that they took the oath of office prescribed by the statute regulating elections by incorporated companies (§ 7, of title 4, chap. 18, part first, of the Revised Statutes,) and immediately proceeded to open the polls and receive votes from the stockholders present offering the same, and received the votes of persons so voting, in person and by proxy, upon 10,742 shares of the stock of such corporation, all of which votes were given for the said class of directors, headed by the said J. Pierpont Morgan ; and that they held such poll open until about half-past one o'clock of the same day, and then canvassed the votes and made and executed in proper form a certificate of election, certifying in form and effect that the said class of thirteen persons, headed by J. Pierpont Morgan, were duly elected directors of said company, and that each one of them received 10,742 votes for such office, and all the votes cast at such election.

So far as the form of the proceedings upon this election is concerned, I do not see why it was not in all respects regular and valid. The inspectors took the proper oath, and proceeded in the regular and usual way to hold said election. The treasurer presented to them an alphabetical list of the names of the stockholders entitled to vote at such election, comprising the names of all the stockholders whose names appeared upon the ledger and transfer books on the previous 7th of August, or whose stock, scrip, power of attorney or assignment for transfer had been presented to the treasurer for transfer before that day. No votes were received except from persons, or their proxies, who appeared by such list of stockholders to have been stockholders on the said 7th of August, and their names were carefully marked and checked upon such list as their ballots were received. It is true that every vote so received was challenged by some person appearing and claiming to have a proxy entitling him to vote at such election, but not by any stockholder or person holding a proxy, who did in fact vote or offer to vote at such election. The person so making the respective challenges did also demand to see the books or the transfer book of the company at the time of making such challenges. These challenges were disregarded so far as the same related to the production of the books, but reference in respect to the right to vote in each case was made to the said list of stockholders so provided by the treasurer. The party making these challenges was not entitled to a production of the books. The challenges were doubtless made in pursuance of the by-law number two of the company, above set forth, which must have been adopted prior to 1852; for the by-law, section number one, provides for an election to be held on the first Tuesday in September, 1852, and the printed book of by-laws, a copy of which has been furnished to me, appears to have been printed in 1853.

After that period the general railroad act was amended, in 1854. Section five of the amended act provided " that at every election of directors the books and papers of such com-

The People *v.* The Albany and Susquehanna Railroad Company.

pany shall be exhibited to the meeting if a majority of the stockholders present shall require it." This provision applies to the election of directors of all railroad companies organized under the general law. But if this by-law were in force it would be simply directory, and the omission to comply with it, and the disregard of the challenge would not invalidate the elections if otherwise valid. It would doubtless cast upon the parties claiming under it the burden of showing that the persons voting at such election, and so challenged, were or appeared by the transfer books on the 7th of August, previous, to be actually stockholders in said company, and for the number of shares so voted. This was done on the trial by the production of the books, and the production of the ballots then deposited and preserved, and the proxies presented to the inspectors, and delivered to them at the time of such election. From the books and list of stockholders so voting, the ballots deposited, and the proxies so delivered and produced, it appears that the persons who voted at that election, in person or by proxy, were actual and lawful stockholders of said company at the time, and were legally entitled to vote at such election, with possibly an exception in respect to one or more of such voters, which, as there were no opposing votes, cannot affect the validity of the election, if it were in other respects lawfully held by said inspectors. The fact that the poll of said election was not open until after twelve o'clock, and was held open until after one o'clock, does not affect the validity of the election. It would not have been lawful to open such election before twelve o'clock, for that was the time fixed in the notice, and no one was bound to be present before that time ; but after the election was begun it was not improper for the inspectors to keep it open as long, within a reasonable discretion, as was necessary to receive the votes of all the stockholders present, ready and offering to vote. (Vide 19 Wend., 147. In the matter of the *M. & H. Railroad Company.*

The objection that the meeting of stockholders held in the hall of said office or building was called to order by Henry

Smith, who was not a stockholder, is not tenable. He held a proxy given him and others to vote for one town, and besides he was requested by Ramsey, the president, to call such meeting to order and to act for him. This request was sufficient authority for him to act in the place of Ramsey, who was then held in custody upon an arrest by the sheriff of Albany, in an adjoining room. The call was recognized by a large number of stockholders then present. Hendrick, who acted as chairman, was a stockholder, and he was chosen by the affirmative votes of many stockholders present, no one objecting. The vote put by him on the election of the inspectors was fairly and properly put, and the inspectors duly elected by stockholders in such meeting, but few if any voting in the negative. The inspectors immediately entered upon the discharge of their duty, and many stockholders recognized them as lawful inspectors and proceeded to vote at the poll opened by them. If nothing else appeared, this election so held by them would unquestionably be valid, and the persons voted for as directors declared by them to have been duly elected, would be the legal directors of said corporation if the meeting of stockholders at which they were so elected inspectors was a lawful meeting. And there is no ground for its impeachment presented in the evidence or seriously urged at the trial, except that a prior meeting of stockholders had been duly held in the directors' room of said building on the same day, over which Walter S. Church presided, at which another set of inspectors had been duly elected who had opened a prior poll and held another election at which other directors were duly elected, and this brings me to the consideration of the second leading and important issue in the cause.

2dly. Was the election held by Hamilton Harris and others acting as inspectors, and at which it is claimed that Charles Courter, Walter S. Church, and others were elected directors, a legal and valid election ?

The fact is undisputed and indisputable that a stockholders' meeting was held in what is called the directors' room of said

company, by a portion of the stockholders of the corporation, prior to the meeting so held in the hall of said building over which James Hendrick presided; that Walter S. Church was chairman of such meeting, and J. R. Herrick secretary ; that Hamilton Harris, Joseph Bush and James Oliver were elected inspectors, that such inspectors immediately proceeded to the room called the treasurer's room in said building assigned for the purpose of the election, and opened a poll and proceeded to receive such votes of stockholders as were offered, and continued open said poll until one o'clock P. M., when they closed the same, canvassed the votes, and declared Walter S. Church and the twelve other persons named and voted for, on said ticket, duly elected directors of said corporation. It is also clearly established and undisputed that this stockholders' meeting was called to order and organized about fifteen minutes before twelve o'clock; and that the said inspectors, chosen at such meeting, proceeded to the treasurer's room to open the said poll, and took possession of the polling place, and declared that they came there to act as inspectors at about five or six minutes before twelve o'clock; and that about twelve o'clock, Colonel North, who moved the organization of such stockholders' meeting, moved a re-organization of that meeting, and that said inspectors be reappointed and proceed with said election. Upon the question whether the said inspectors actually received any votes before twelve o'clock, there is a conflict in the evidence.

The organization of this stockholders' meeting before twelve o'clock was obviously a surprise upon many of the stockholders entitled to attend and take part in such meeting.

The notice for the election fixed the time at twelve o'clock at noon, and there was no notice given or published of a stockholders' meeting for any other time, or for any other meeting of stockholders, except such as was involved in a notice of the election. There was nothing in such notice to apprize the stockholders that there was any occasion for their assembling before twelve o'clock, or that any other business

was to be transacted except that of the election. So far, therefore, as this meeting and its acts are concerned, including the appointment of inspectors, I think there can be no doubt that there was surprise and fraud upon many of the stockholders, and, as against such stockholders as did not participate in such meeting, the same was irregular and void; all acts done by portions of the corporators, which bear the appearance of trick, secrecy or fraud, will be held invalid. (Wilcox on Corporators, 51.) Surprise and fraud upon part of the electors is ground for avoiding an election. This principle is asserted in many cases. (11 East, 77, *Rex* v. *Gaborian;* Grant on Corporations, 204; 11 Wend., 611, *People* v. *Peck;* 36 How., 108, *Matter of the Pioneer Paper Co.*) But it is claimed that the re-organization of the meeting at twelve o'clock cured this irregularity. This would doubtless be so if the new organization were a full, fair and open re-organization like a new meeting, and attended with no circumstances of deception or unfairness. If the meeting held before twelve o'clock had been entirely abandoned in all respects, and it had been announced that it was so abandoned, and the reasons for a stockholders' meeting had there been fully stated anew, and a new organization then had as of an original meeting, I should have no doubt that such new meeting would be a regular and valid one. But I think this rule will hardly apply in this case. The inspectors had gone to the treasurer's room and proclaimed themselves inspectors and had opened the polls and had proceeded to act as inspectors. They were not recalled. They did not abandon their places or positions and return to the meeting for a new lease of power, or renounce their claim to be inspectors, but kept their places, assuming to be inspectors, and claiming the right to receive votes, if they did not actually receive any before the moment of twelve o'clock arrived.

The resolutions passed at the reorganized meeting were not new resolutions prepared at the moment, but were resolutions previously prepared, and on their face assume the existence and continuance of an organized meeting and the

previous appointment of inspectors.   The resolutions of the
new meeting are as follows :

  "*Resolved*,  That this meeting proceed with the annual
election of directors and inspectors, with Walter S. Church
as chairman, and Jonathan Herrick as secretary."

  And next—

  "*Resolved*,  That the annual election of the directors and
inspectors proceed with Messrs. Harris, Bush and Oliver as
inspectors in the place of Messrs. Hand, Lathrop and Haskell,
ineligible and removed."

  It seems to me that if the case depended upon this point, I
should be bound to hold that the reorganized meeting was in
fact and in legal effect but a continuance of the first meeting.
The first meeting did not break up.   The chairman and sec-
retary retained their seats at the table with their friendly
stockholders, where they sat at the first meeting, and there
was no abandonment of the room or a relinquishment of its
pre-occupation by those who held the first meeting, and no
formal organization of a new meeting in the ordinary way.

  (It appeared that there was a discrepancy between the time
kept at the company's ticket office and in the treasurer's room,
and the time of the watches of those in the stockholders'
meeting, at which Mr. Church presided, and at the election
held by Hamilton Harris and his associate inspectors.   The
cause seemed to have been that the Fisk party sent a young
man to the observatory, to get the true time ; he returned
and reported the time by his watch, as set by some person
at the observatory, and most of the party set their watches by
the time so reported.   And the learned justice reviews the
testimony, as to the correct time, and then proceeds as
follows :)

  It is thus, I think, quite evident that the reorganization
was moved at least three minutes before twelve o'clock by
the time in the treasurer's and ticket offices of the company,
which, I think, was more to be relied on as the true time in
the city of Albany, at that point of time, than the time
reported by Wilber, as the observatory time, by his watch,

set by a man he did not know and by a clock he did not see, which might be done mistakenly, and possibly deceitfully; for it appears that it required a change of most of the watches of the party, whose movements were regulated by the time so reported. If it were important or essential to the decision of the case, I should be inclined to hold that the time of the clock in the offices of the company, which regulated the running of the trains, and was, as Van Alstyne testifies, regulated daily by telegraphic communication with the observatory clock, should be held to be the true and proper time to regulate the proceedings of the stockholders at their corporate meetings, and should be considered as affording the true test for the determination of the actual time at the period in question, for the purpose of said election.

But the legality of this meeting, in its first organization, and its reorganization, and of the election held under its authority, was denied and contested on the trial and argument, in connection with these questions, chiefly upon the ground that it was part of a scheme or conspiracy, through the form of an election, for a minority of the stockholders of said corporation to obtain the control of said railroad by James Fisk, Jr., Jay Gould and others acting in concert with them, and in fraud of the just rights of the stockholders holding a majority of the stock of said company. It clearly appeared that from dissatisfaction, on the part of some members of the board of directors, with Mr. Ramsey, or other cause, early in the summer, in conjunction with Messrs. Fisk and Gould (Mr. Harris testified he was retained by Mr. Gould as counsel in the matter in June), efforts began by the purchase of stock, to prepare for a change in the directors of the railroad company at the coming election, to be held in September; and these efforts continued up to the 7th of August, the day for closing the transfer books.

This proceeding was entirely legitimate, proper and lawful. It is the law of joint stock corporations, that a majority of the stockholders in interest shall control in the election of its officers. and in its management.

Besides these efforts in the purchase of stock, to get the control of the road at the ensuing election, proof was given at the trial to show that resort was had to various judicial proceedings, with the preconcerted design and intent to prevent an honest and fair election, by excluding votes that could not be controlled by the Fisk and Gould interest, and to hinder and prevent a free and true expression of the wishes of the other stockholders at such election, in respect to the future management and control of the said road.

It appears that up to the time of the commencement of this action, twenty-two different suits had been commenced and instituted by the different parties interested in this controversy. With those suits and proceedings, I have nothing to do in this connection, except as they preceded, related to, or were designed to affect, influence or control the election held on the 7th of September.

The first of the suits of this description was commenced by Joseph Bush, on or before the 3d of August, against David Groesbeck, Samuel Sloan, Samuel C. Thompson, Ossian D. Ashley, C. H. Dabney, J. P. Morgan and G. H. Morgan, Goodwin and Walter H. Burns. The complaint alleged that 3,000 shares of the stock of said company, had been illegally issued by Mr. Ramsey to said parties, in the month of December, 1868, and prayed that said stock be declared unauthorized and void, and be given up to be canceled; and the holders thereof be restrained by injunction from parting with, assigning, or in any way incumbering the said shares of stock by them respectively held; and that a receiver of said shares be appointed. In this suit an *ex parte* order was made in this court at a Special Term, held in New York, on the 14th of August, appointing William J. A. Fuller receiver of said 3,000 shares of stock. The parties above named were required to deliver the said shares to the said receiver, upon demand, and the said receiver was directed to take immediate possession thereof.

Upon the facts stated in the complaint in this action, I do not see why this injunction was not properly issued. The

facts which existed and now appear that said 3,000 shares were issued by the express authority of the board of directors, upon valid contracts, for the benefit of the corporation, and was all valid stock owned by the corporation, acquired by forfeiture for the non-payment of calls made upon the subscriptions, were either unknown to, or were purposely suppressed by the plaintiff.

But the order for the appointment of a receiver *ex parte* must have been granted incautiously, and upon some mistaken oral representation or statement of the facts of the case, as it was in clear conflict with the law and settled practice of this court. In *Verplanck* v. *The Mercantile Insurance Company* (2 Paige, 450), Chancellor WALWORTH states the rule as follows: " By the settled practice of this court, in ordinary suits, a receiver cannot be appointed *ex parte* before the defendant has had an opportunity to be heard in relation to his rights, except in those cases, where he is out of the jurisdiction of the court or cannot be found, or where, for some other reason, it becomes absolutely necessary for the court to interfere, before there is time to give notice to the opposite party to prevent the destruction or loss of property." The same rule is reasserted by the chancellor in *Sandford* v. *Sinclair* (8 Paige, 374), and in *Gibson* v. *Martin* (idem, 481); and is asserted in numerous cases, among which are *Field* v. *Ripley* (20 How. P., 26); *McCarthy* v. *Peak* (9 Abbott, 166), and *Dowling* v. *Hudson* (14 Beavan).

In the case of *Verplanck* v. *The Mercantile Insurance Company* (*supra*), the chancellor also said that " in every case where the court is appealed to, to deprive the defendant of the possession of his property, without a hearing or an opportunity to oppose the application, the particular facts and circumstances, which render such a summary proceeding proper, should be set forth in the bill or petition on which the application is founded."

In this case, no facts are stated in the complaint calling for the immediate appointment of a receiver. It was not stated that the defendants were irresponsible, or that there

was any danger of loss from the transfer of the stock, and upon the facts appearing on the trial, such allegations could not have been truly made; for the said defendants are rich men, and generally of abundant responsibility to account for the stock, if they had violated the injunction and transferred the scrip; and the plaintiff had not and did not pretend to have any title to the said stock or lien upon it, and had simply the rights of a stockholder of said company, if all the allegations in his complaint were true, to have judgment that the said scrip and stock be cancelled and surrendered.

But the facts clearly show that these 3,000 shares of stock were all valid stock. It was issued by the company, as before stated, by the authority of the board of directors, and composed part of an amount of forfeited stock owned by the corporation. By the forfeiture, the stock became the absolute property of the corporation, and might be sold at its value, and a proper stock certificate given therefor without any re-subscription. (*Otter* v. *Brevoort Petroleum Company*, 50 Barb., 247 and 255; *State Bank of Ohio* v. *Fox*, 3 Blatchford, 433; *City Bank of Columbus* v. *Bruce*, 17 N. Y., 512; *Small* v. *Herkimer Manufacturing Co.*, 2 Comstock, 337.)

As this stock was thus clearly valid stock in the hands of the defendants enjoined in that suit, and the order for the appointment of receiver not warranted by the facts, the prompt steps of the receiver in getting possession of this scrip, as he did from Groesbeck of 900 shares, by taking with him a sheriff's officer when he made the demand, and explaining the nature of a writ of assistance, intimating in effect that he or the officer had such writ, connected with the fact that he was at Albany on the said 7th of September, and voted on said 3,000 shares at the Harris poll, without any other title to the said stock or any transfer to him on the books or of the scrip, would seem to warrant the inference that this suit was instituted for the fraudulent purpose not only of getting possession of this scrip, and preventing the owners of it from voting upon it, against the interest of the Fisk party at the election, but also with the intent actually

to vote upon it as valid stock, in opposition to the wishes of its owners, and in aid of the objects and interests of Mr. Fisk and his associates, in carrying the election of his set of directors.

The next fraudulent proceeding which seems directed to affect the election are the suits of David Wilbur, in one of which an injunction was issued restraining the defendant, Ramsey, from acting as president of said railroad company, which suit was followed by another suit on the next day, August 6th, in which Azro Chase was plaintiff, and the corporation and others defendants, in which an injunction was issued, and James Fisk, Jr., and Charles Courter, upon an *ex parte* application, were appointed receivers of said railroad. In pursuance of such appointment, it appears that the said James Fisk, Jr., and Charles Courter, immediately applied to the persons in possession of the office of the said railroad cₒmpany in Albany, and demanded to be let into possession of said railroad as such receivers, and upon being refused such possession, attempted to take such possession by force from persons claiming to be in possession of such office and railroad, under the authority of Robert H. Pruyn, who also had been appointed a receiver of said corporation in a suit instituted in Albany county, wherein John W. Van Valkenburgh was plaintiff, and claimed to be in possession of its property as such receiver, under an order made by one of the justices of this court of the third judicial district.

The appointment of Fisk and Courter as receivers of the said railroad and its property and franchises, is obnoxious to the same objection made in the appointment of Fuller as receiver, in the suit of *Bush* v. *Groesbeck*, and following the suits above mentioned, it seems to me must have been applied for and procured (as it was *ex parte*) in order to affect the election by giving Messrs. Fisk and Courter the advantage of the immediate possession of the said road, and the control of its affairs, its books, papers and property.

The next judicial proceeding, which it is claimed on the argument was designed to affect the election, was the suit of

Stanton Courter against the corporation and others, including Hand, Lathrop and Haskell, elected inspectors in the year 1868 for the year 1869. In this suit an injunction was issued restraining the said inspectors from acting as such, at said election, on the ground that they were not stockholders of the corporation.

The summons in this suit is dated New York, September 2, 1869. The venue in the action was laid in the county of Broome, in the sixth judicial district, and the injunction was granted by a justice of this court of the first judicial district, doubtless without knowing or having his attention called to the fact, that the place of trial of said action was in another district. The prayer of the complaint was, among other things relating to other defendants, that the said Hand, Lathrop and Haskell be restrained from acting as inspectors or from receiving or counting any votes at said election or at any election of officers of said company, and contained no other prayer for relief as against the said Hand, Haskell and Lathrop.

The by-laws, which required the inspectors to be stockholders of the company, had fallen into disuse, and had been disregarded by the continued election from year to year, by the stockholders of persons not stockholders for inspectors. The same persons had been chosen for the three previous successive years as such inspectors, without dissent or objection, and I much doubt whether said by-law was ever of any force or validity, and whether the directors could thus restrict the choice of inspectors. Clearly their election was not void. The election of an unqualified person to a corporate office is merely voidable and not void. (2 Kyd on Corporations, 9 ; *Crawford* v. *Powell*, 2 Burr, 1013 ; *Rex* v. *Bridge*, 1 Maule and Selwyn, 76.)

It seems to me quite clear that this injunction was improvidently granted, and that the officers of a corporation cannot be thus summarily removed from office by a court of equity. But it was doubtless the duty of the said inspectors to obey the injunction as they did. No allegation or suggestion is made in the complaint that the said Hand, Has

kell and Lathrop, except that they were not stockholders, were not competent and proper persons to act as inspectors. The injunction appeared to have been signed by the judge who granted it on the 6th of September. The use that was made of this injunction is, I think, the more serious ground of objection to it. If it had been procured and served a day or two at least before the time fixed for the election, it could have done no particular injury, or created any special surprise to affect the election. It was in the possession of one of the attorneys and counsel acting for Mr. Fisk on the evening of the 6th of September. It was talked about in the meeting held the same evening at the Delavan House, by Mr. Fisk and his friends, and one of the resolutions drawn up for adoption at the stockholders' meeting, to be held the next day, stated that the inspectors had been enjoined, and the whole scheme of operations of Fisk and his party, for the next day, and the necessity for a stock-holders' meeting, depended upon that fact, and the service of that injunction at the proper time, and pre-supposed such service. Mr. Shearman, the chief attorney for Mr. Fisk in this controversy, and the one who apparently chiefly directed the operations and movements of the Fisk party at the stockholders' meeting and at the election afterward, testified in respect to such service, and his movements in connection therewith, as follows :

"I set out for the offices of the Albany and Susquehanna railroad in a carriage, at about twenty minutes past eleven in the morning of that day. On my way there, I saw two inspectors of election, whose names I knew then, but cannot now recall, and I saw a gentleman serve them with a paper which I had given to him, and which included an injunction against their serving as inspectors on that day."

And he further said that he then went immediately to the office, and when he got into the directors' rooms it was about half past eleven.

The procuring and keeping back this injunction and serving it at the time and in the manner stated, was an obvious

and designed surprise upon the great body of stockholders of the corporation. They had no reason to expect that said inspectors would be enjoined, and, therefore, had no occasion to assemble promptly to provide for the exigency created by their removal or declination to act, by the choice of new inspectors, in a stockholders' meeting. It cannot be considered otherwise than a scheme contrived and devised to take an unfair and improper advantage of the stockholders not in the interest of Mr. Fisk in respect to the conduct of the said election. It was suggested on the argument that a primary reason for objection to these inspectors and procuring of said injunction was, that the chairman of the board of inspectors, Mr. Hand, was one of the counsel for Mr. Ramsey. Apparently, this was a good objection, for it is quite important that inspectors of such elections where there is controversy and contest, should be impartial and disinterested men, for they act in part judicially as well as ministerially. But if it were a valid objection to Mr. Hand that he was counsel for Mr. Ramsey, I do not see why it was not equally a valid objection to Mr. Harris, who was a leading and most active counsel for Messrs. Fisk and Gould in this matter. And Mr. Bush (another inspector chosen to act with Mr. Harris) too, was deeply interested in the contest on the same side, being plaintiff in the suit instituted to procure the appointment of Mr. Fuller, receiver of the 3,000 shares of stock held by Groesbeck and others.

The next judicial proceeding designed to operate upon the election, as claimed by counsel on the trial, was the commencement of a suit in the name of the railroad company against Joseph H. Ramsey, Henry Smith and William L. M. Phelps, in which action an order for their arrest was obtained in the sum of $25,000.

By whose authority this suit was commenced does not distinctly appear. It was, however, commenced by the same attorneys who had commenced all the previous suits for the parties acting in concert with or in furtherance of the interests of Mr. Fisk. . The order for their arrest was obtained on

the 6th of September, and taken to Albany the same afternoon. The complaint was produced and proved on the trial, but by some mistake was not left with me; but I understand that the cause of action for which this order of arrest was granted was, that the defendants were charged with taking and carrying away from the office of the company certain books of the corporation. These books certainly belonged in the office of the company, and their removal could not be justified except upon the just apprehension on the part of the officers of the company that they were not safe in the office, and were there liable to be seized and taken away by force or fraud, and without right. They were, in fact, removed with the knowledge and assent of the president and treasurer of the company, and upon the advice of their counsel, on the evening of the 5th of August, the night before the attempt was made by Fisk and Courter to take possession of the said office, by force, as receivers.

On the morning of the 6th of August, it appears that Robert H. Pruyn was put in possession of the office of said railroad as receiver, and thereafter until the appointment by the governor of Robert L. Banks, on the 13th of the same month, as executive and financial agent, to take charge of the road and operate the same, as such receiver had the lawful custody of the books and papers of said corporation; and it appears that he was acting in concert and sympathy with Mr. Ramsey and the said officers and persons who took away the said books, and that Phelps, the treasurer retained under him, had access to the books and made entries in the same, from time to time, under the direction or authority of said Pruyn. The appointment of Mr. Banks as executive and financial agent, upon the request and stipulation signed by the parties, and delivered to the governor, gave him the right to the possession and control of the said books, and virtually superseded both receivers. So that when this suit was commenced, neither of these receivers were entitled to the custody of the said books, or to bring any suit for their conversion, or their non-delivery to the agents of the governor.

The books were, in fact, returned to the office on the night of the 6th of September, and put under the control of Mr. Banks, so that when the suit was actually commenced, by the service of the summons and complaint, they were in the actual custody of the plaintiff, if the agents of the governor properly represented the corporation.  Fisk and Courter, had clearly no right to bring the action as between them and Pruyn, who had been previously put in possession of the offices, under the order and authority of this court.  Except for the appointment of Mr. Banks, as agent of the governor, the custody and control of these books, with all the other property of the corporation, had been assumed by this court, and committed to its receiver, Mr. Pruyn, and the authority of Fisk and Courter was in abeyance, at least, until the court, upon a proper application to it in the third district, had vacated the appointment of Pruyn, and directed the surrender of his trust, and the transfer of the property of the corporation to Fisk and Courter.  Fisk and Courter, therefore, had no right to institute this suit in the name of the Albany and Susquehanna Railroad Company, and the order of arrest was unauthorized.  But assuming it to be otherwise, the order to hold to bail in the sum of $25,000, was most extraordinary and exorbitant, and must have been procured to be used, as it was used, on the day of election, in aid of the fraudulent purposes of Mr. Fisk and his associates.  It was delivered to the sheriff of Albany, at about nine o'clock in the forenoon, of the 7th of September, with instructions to do his duty; and it seems, that he deemed it his duty to serve such order of arrest in person, and, as he says, at about fifteen minutes before twelve o'clock; just about the time the stockholders' meeting, held in the directors' room, was called to order by Colonel North.  It also appears from the testimony of Mr. Ramsey, that he was detained, and held in custody about half an hour before he could get released by the execution, and acceptance of a satisfactory bail bond.  The arrest of Mr. Ramsey and his counsel, Smith, and the treasurer, just at this juncture, could not have occurred, under the circumstances,

without particular design.   The sheriff testified, that he knew that the election pending was to take place at twelve o'clock; that Mr. Ramsey was prominently interested in that election; that Mr. Smith was prominently interested as counsel in the matter; and that all the defendants were well known citizens and residents of Albany.

This order of arrest, thus procured, and thus executed, could have no other object or purpose, on the part of those who instigated and directed it, than to hinder and embarrass Mr. Ramsey, and his friends among the stockholders, and prevent them from participating in the stockholders' meeting, and possibly in the election.   Some difficulty was found, as it appears, in getting bail, and if it had not chanced that able and responsible bail had been soon obtained from persons in attendance upon the election, the defendants probably would have been unable to take any part in the election.

I come to the remaining branch of the evidence, tending to establish the fraudulent combination and conspiracy, imputed to Mr. Fisk and his associates, in respect to the stockholders' meeting held in the directors' room; I mean the pre-occupation of said room before the time fixed for the election; and by persons not stockholders of said company.

Mr. Herrick, the vice-president of the company, testified that the superficial area of the room called the directors room, deducting for table and desk, is 309 square feet, and that estimating three square feet for a man, the said room would hold 103 men.   This estimate does not exclude chairs, and it appears that numbers were seated in chairs.   It clearly appears, that this room began to be filled preparatory to this meeting, at about half past eleven o'clock.

Mr. Harris testified, that he went to the office of the railroad company at about half past eleven, accompanied by Mr. James Fisk, Jr., Judge Parker, and Mr. Field; that they arrived there soon after half past eleven, and went immediately to the directors' room, which they found about half full of men; that he recognized many persons in the room at the time they entered, and then came others he did not know

Mr. Church testified, that he arrived at the room about twenty-one minutes before twelve o'clock; that he went directly to the directors' room, and found it partially filled with people, among them, some of our lawyers and inhabitants, and other parties residing on the line of the railroad, and parties connected with the road, and named twenty-eight persons then present whom he then recognized. It also appeared from the testimony of this witness, that a meeting was held at the Delavan House the evening previous (the 6th of September), composed of Mr. Fisk, Mr. Field, Mr. Harris, Mr. Herrick, Leonard, Sherman, and two or three other old directors of the Susquehanna road; that the subject of a stockholders' meeting, to be held the next day, was discussed, and who should be inspectors and officers of said meeting, was talked about, and it was understood, they should meet at the directors' room the next day at half past eleven.

It clearly appears, that after the arrival of Mr. Fisk and his counsel and friends among the stockholders, the room rapidly filled, and that when the meeting was called to order by Colonel North, at about fifteen minutes before twelve, it was quite full, and by twelve o'clock it was densely packed. And I think it is clearly established, that of the persons so filling and occupying said room, from fifty to sixty, at least, were imported, came, or were brought there upon the employment of James Fisk, Jr., or his agents, from the city of New York, who were not stockholders in said company; many of whom were of a rough, low class of men, such as in common parlance would doubtless be classed among the roughs and fighting men of that city. These men came together in a railroad car, and arrived in Albany early on the morning of the 7th, and were fed, and controlled, and taken to the said room under the lead of men confessedly acting in the employ of Mr. Fisk, and many of them furnished with proxies, that they might vote, as the counsel for Mr. Fisk avowed on the trial, at all *viva voce* votes that might be taken in the meeting.

The testimony of Mr. Hendrick seems to me, to give a

fair representation of the actual condition of things in this room at, and before the time of the meeting there held. He testified, that he arrived at the said office at about half past eleven o'clock; that he went first to the directors' room; that it was then full, in the eastern part overflowing. I had, he said, great difficulty in getting to the front. He was asked, by what class of persons? and answered: "They were strangers to me, and the hardest set of men I ever saw in my life. I should think seven-eighths of them were of that character. The room was very full. I think any sensible number of men could not be crowded into the room in addition to the number there." Of these men, it appears forty-four, or forty-five were fed in the restaurant kept at the Union depot, in the northern part of the city, immediately on their arrival at Albany from New York, and their breakfasts paid for by some of the agents of Mr. Fisk. These men were then taken to another restaurant near by, kept by Joseph Clinton, to be furnished with proxies. He describes them as follows: "They were common laboring men; some of them dressed roughly, and some better. There were men in shirt sleeves, some with blue shirts and overalls. Some had their coats under their arms, and some had no coats."

Orange Stevens, a witness, called in behalf of the Fisk side of the controversy, testified that he was a passenger conductor on the Erie railroad; that he came up from New York on the same train with these men; that he gave about twenty of them proxies, in a restaurant, near the depot of the Susquehanna railroad. Another witness, Pollard, came from New York with these men, and gave some of them proxies in the office of the railroad, and some in the restaurant; saw them march into the room under the charge of four different persons, each having charge of a set or file of five or six of the men, and said the room was half full when they went in. The whole evidence upon this point, I think, fully establishes that this room at, and about twelve o'clock, was so fully packed with this description of men, with con-

ductors on the Erie road, and other agents and retainers, employés of Mr. Fisk, or persons under his control, and acting in his interest, together with other persons comprising stockholders, friendly to Mr. Fisk, and others acting in concert with him, as utterly to exclude a large portion of the stockholders attending, and entitled to take part in a stockholder's meeting, at that hour, from access to said room, and preclude them from an open, free and fair, and safe participation in the proceedings of such a meeting. The importation, and crowding into a small room of such a class of men as I have described, and furnishing them with proxies, that they might participate in the proceedings of such meeting, and in the election afterward, was a gross perversion and abuse of the right to vote by proxy, and a clear infringement of the rights of the *bona fide* stockholders of the company, tending, if such proceedings are countenanced, and allowed by the courts, to convert corporation meetings into places of disorder, lawlessness, and riot; and it is doubtless due, considering the temper of the parties, to the vigilance of the Albany police, that this meeting did not end with violence and bloodshed.

Upon the whole evidence upon this branch of the case, I think I am bound to find, as matter of fact, that there was a preconceived scheme, combination, or conspiracy, to carry the election of directors, appointed to be held at the time and place aforesaid, by the use and abuse of legal process, and proceedings, and by efforts and contrivances to prevent a fair election of inspectors at a stockholders' meeting, made necessary by the injunction against the inspectors elected in 1868, procured, used, and served as above stated, with the concurring pre-occupation of the room where such meeting was to be held, with such number of persons as utterly precluded a free and fair meeting for such purpose.

And I am accordingly bound to find, as matter of fact, and of law, that the election held by Hamilton Harris, Joseph Bush, and James Oliver, acting as inspectors, was therefore irregular, fraudulent and void.

There is still another subject for consideration in respect to this election. It was held in distinct violation and disregard of two injunctions, issued out of this court, and duly served upon the said inspectors. One injunction was issued in the suit of David Groesbeck, and others against Jay Gould, James Fisk, Jr., and others.

This injunction required the defendants, Hand, Lathrop, and Haskell, inspectors of elections, their successors, substitutes, and all and every other person, who might in any way be appointed or selected to serve as inspectors of elections, or to hold any election for directors of the Albany and Susquehanna Railroad Company, absolutely to desist and refrain until the further order of the court, at any election on the 7th day of September, 1869, or any subsequent day, whenever the plaintiff, and the other owners of 3,000 shares of said company should be enjoined, or they be forbidden to vote upon the same by any injunction, or order, or judgment or process, of any court; and they were also forbidden to receive any vote, or votes on the part of the defendants, Jay Gould, James Fisk, Jr., Charles Courter, Jacob Leonard, Samuel North, Azro Chase, David Wilbur, Alonzo Evarts, Jonathan Herrick, Joseph Bush, Hamilton Harris, and James Oliver, in person or by proxy, or as the proxy or substitute in anywise of any other person, unless the plaintiff and the other holders of said 3,000 shares of stock, and of every portion thereof, should first have an opportunity to vote upon all of the said shares, by them held respectively. ' This injunction was served upon Mr. Harris, and his associate inspectors, before they had received any vote, and was immediately disregarded, and disobeyed in letter and intent, by them, by receiving the vote of W. J. A. Fuller, who voted as receiver of the very stock upon which the plaintiffs in said action were restrained from voting. The other injunction was granted in a suit, in which Minard Harder was plaintiff, wherein, and whereby, the said inspectors were commanded to desist, and refrain from holding any election of directors, or from receiving and counting, and canvassing

any votes thereof. This injunction, as well as the one directed to Hand, Haskell, and Lathrop, and the one forbidding Joseph H. Ramsey from acting as president of said railroad company, I think, were entirely void. I do not think a court of equity has any power to restrain a public officer, or an officer duly elected, or appointed, by a corporation, from performing the general, ordinary, and proper duties of such office. It may restrain him from doing some particular wrong or injury affecting private rights; and it may suspend, or remove a director, or trustee, of a private corporation upon due cause being shown, and due notice given, for any gross violation of duty or corruption in office, but it cannot remove him by injunction, without notice or without a hearing. But the first mentioned injunction issued or granted in the suit of David Groesbeck, and others, has been sanctioned in form and substance by the District Court of the United States, in the case of *Brown* v. *The Pacific Mail Steamship Company* (5 Blatchford, 525), and, I should think, was modeled after the injunction issued in that case. It was, I think, a valid injunction, and as such it was the duty of the inspectors to whom it was addressed to obey it. The writ of injunction is doubtless liable to abuse, and is unquestionably, often granted incautiously; but while a court with equity powers exists in this State, the process of injunction is an invaluable, an indispensable instrument in its hands to enable it to discharge its proper duties, and to prevent wrongs and injustice, and it must be maintained in its integrity, and obedience to it required and enforced.

In *The People* v. *Sturtevant* (5 Selden, 263), Judge Johnson, in giving the opinion of the Court of Appeals, said that "the principle is of universal force, that the order or judgment of a court having jurisdiction, is to be obeyed, no matter how clearly it may be erroneous. It is only when it acts without authority, that its orders are regarded as nullities; they are then not voidable but simply void."

This election would doubtless have been set aside on a summary application to this court, pursuant to § 5 of title 4

of chapter 8, of the Revised Statutes, part first, on the ground that it was held in distinct violation of this injunction; and I think in this proceeding, where the regularity of the election is in question, the fact that said election was held in violation of an injunction, must be considered.

As upon the grounds above stated, I have come to the conclusion, that the election of the Courter and Church set of directors was and is not legal and valid, it follows that the priority of right, depending upon the prior organization of the stockholders' meeting, over which Walter S. Church presided, is removed, and such meeting is to be regarded in law, as if it never had been held; the consequence of which, upon the views above stated, is that the stockholders' meeting, over which James Hendrick presided, was the only regular, legal and valid stockholders' meeting, held on the said 7th of September; and that the inspectors elected at that meeting were lawful inspectors, and the election held by them for directors of said corporation, a legal and valid election.

The argument that Harris, Bush and Oliver were officers *de facto,* and the election held by them is valid upon that ground, is untenable. There can be no such officer as an officer *de facto,* as against the people, in an action at the suit of the people to try the title to the office. The doctrine in respect to officers *de facto,* only applies to, and in favor of third persons, and to protect innocent parties who have trusted to the apparent title of an officer. (*Ex parte* Wilcocks, 7 Cowen, 402; *Boardman* v. *Halliday,* 10 Paige, 223; *People* v. *Albertson,* 8 How., 363; *Weeks* v. *Ellis,* 2 Barb., 325.)

These views would seem to make it unnecessary for me to go further in the examination of the great mass of evidence, given and received in the cause. Much of it was given and received, upon the assumption that I might find it necessary to order a new election, and in that event I must determine, who would be entitled to vote at such election.

But as the court, in this class of questions, will seek to

subserve, as far as compatible with the law of the case, the interests of the corporation and, for that purpose, will look to see how the interests of the majority of the stock are to be affected by its decision, 1 will proceed to state my views in regard to a few of the questions litigated and discussed in respect to this question.

It appears that at the Harris poll, there were cast 13,400 votes, and at the Snow poll, 10,742. Transfer the 2,500 shares improperly voted upon by Fuller from the Harris to the Snow poll, and it would give the majority to the latter poll. From the Harris vote, 1,100 should also be deducted, because the vote was given by commissioners, who had previously been removed from office, and their places filled by new officers. The *certiorari* brought to review the proceedings, did not restore the old officers, and they had no right to cast the vote of the town. Three hundred shares should also be deducted for the town of Duanesburgh, on the ground that this court at General Term had adjudged that said town did not own any stock in said railroad corporation, and was not a stockholder. Without going further into detail on this question, I will simply state that the subscription for the 9,500 shares by Hendrick, Hunt and others, I think, made them lawful stockholders upon such stock of the said corporation. They paid the ten per cent upon it, and cannot avoid the payment of the balance due upon such subscription. The company has had the ten per cent, and the subscription was made in the regular subscription book in the hands of the officers of the company, and created an absolute legal obligation, to take the stock and pay for the same. (*Black River and Utica R. R. Co.* v. *Clarke,* 25 N. Y., 208; *Ogdensburgh R. R. Co.* v. *Wolley,* 1 Keyes, 120.)

The votes upon this stock would have given a great preponderance to the Ramsey set of directors on a single poll. It seems to me quite clear then, that if there had been a single poll, and the stockholders had voted, and their votes been received according to the stock ledger and transfer books, as they stood on the 7th of August, including all such entries

and transfers of stock as the treasurer did make or was bound to make, and which he would have been directed by mandamus to make, if he had refused, the ticket headed by J. Pierpont Morgan, would have been elected by a large majority of the votes of legal and valid stock.

And if, on the contrary, the result had been otherwise, and such result had been brought about by the reception of the votes given by Fuller, and the rejection of the votes of the true owners of that stock, and the reception and rejection of other stock illegally, including the 9,500 shares subscribed for by Hendrick, Hunt and others, this court would have been bound, upon summary application, to set aside such elections. (*Downing* v. *Potts*, 3 Zabriskie, 66; *Ex parte Murphy and others*, 7 Cowen, 153; 19 Wend., 635, *in the matter of Chenango Mutual Insurance Co.*),

The defendant, Jonathan R. Herrick, was not lawfully removed from his office of director by the common council of Albany. At the meeting of said common council, it appears that but one member of the board voted for his removal, and one member voted in the negative, and the presiding officer declared the resolution carried. This was clearly an error, and said Jonathan R. Herrick remains, and is a lawful director of said railroad company, for the city of Albany.

Judgment must, therefore, be given according to these views, adjudging that the Fisk set of directors were not duly elected, and that the Ramsey set were duly elected, and are the legal and lawful directors of said corporation; and further adjudging that the people recover costs in the action against the corporation, the Albany and Susquehanna Railroad Company; and that the complaint be dismissed as against the defendants, Jonathan R. Herrick and Walter H. Burns, without costs, and that all proceedings in the suits mentioned in the pleadings, be perpetually enjoined and restrained; and that the same be discontinued by the plaintiffs on both sides, without costs, and the receiverships of Pruyn, Courter and Fisk be vacated and set aside.

The judgment will further direct that the thirteen defend-

ants, who are hereby declared to have been duly elected directors of said corporation, headed by J. Pierpont Morgan, and also the defendants, David Groesbeck, Daniel T. Chamberlain, John W. Vincent, Daniel Morrell, Dewitt C. Falls, James M. Boyd, Samuel Sloan, Samuel C. Thompson, Martin Green, recover their costs of this action against the said thirteen defendants, headed by Charles Courter and Walter S. Church, whose claim to have been duly elected directors of said corporation, is hereby disallowed. It will be referred to the Hon. SAMUEL L. SELDEN, of Rochester, to pass upon the accounts of the receiver, and upon a hearing of the parties at Albany, to ascertain and report to the court what would be a proper extra allowance in the action, and to which of the defendants it should be paid, and to settle such other matters of detail as may be necessary to carry the judgment into effect.

And it will be further ordered, that the said directors, so held to be duly elected, be let into immediate possession of said railroad, and that the receiver transfer to them all the property and assets in his hands, belonging to said corporation, retaining from the moneys in his hands, all proper allowances for fees, expenses, and other charges to be adjusted by said referee.

In conclusion, I regret that other duties forbid the devotion of greater time and reflection to the examination and decision of this most important cause. It came, an exotic to this district, where the judges are full of labor, and where the people have no interest in the controversy, except such interest as all good citizens feel in the welfare of the State, and in the maintenance of law, order and good government. It is impossible that any judge could enter upon the trial of a cause of such magnitude, without a deep sense of oppression, from the weight of the great responsibility involved in its decision. Including the time consumed in its trial, and required for the examination of the case, it has occupied a month of my time, and diverted me from my particular local duties. My duty is now discharged, and a sense of relief arises from the fact that my decision is not necessarily conclusive upon the parties,

and, if I have erred in judgment or opinion, the error is not irreversible.