The STATE *ex relatione* JOSEPH S. DUNLAP *et al. v.* KENSEY JOHN STEWART *et al.*

An information in the nature of a writ of quo warranto will lie at the suit of the vestrymen of a Protestant Episcopal church, incorporated in conformity with the provisions of the statutes as trustees to take charge of the temporalities of the church, to recover their office as vestrymen against others wrongfully intruding into it.

THIS case was tried before Comegys, C. J., and Houston, J., Wootten, J., absent, and was on an information in the nature of a writ of quo warranto filed by the Attorney-General in the name of the State, at the relation of Joseph S. Dunlap, Peter Kline, Arthur Colburn, Charles G. Ash, George F. Brady, Charles Corbit, Andrew B. Mitchell, and Nicholas G. Price, against Ken-

sey John Stewart, Henry W. Bigger, Everett Von Culin, Clayton Von Culin, Isaac Hunter, and Mark M. Kirby, and which, in substance, alleged that Christ Church, Delaware City, was and is a corporation duly organized under and by virtue of the provisions of the act of the General Assembly in that behalf, being chapter 39 of the Revised Code of this State, and a certificate under the hands and seals of A. S. Pennington, Francis D. Dunlap, A. Von Culin, John A. Barr, and James B. Henry, duly made, executed, and recorded in the office for recording of deeds in and for New Castle County, in book C, vol. 6, p. 527; and that, by the filing of the said certificate, and in pursuance of the provisions of the said act of Assembly, the said church became incorporated under the name and style aforesaid as a congregation or parish of the Protestant Episcopal Church in the Diocese of Delaware, and subsequently applied for and obtained admission to union with said church in accordance with the provisions of the constitution and canons thereof, and has, since then, been duly represented in the annual convention thereof, and that, by the express terms of its certificate of incorporation aforesaid, the said congregation or parish professed adherence to the said church in its doctrine, discipline, and worship, and thereby and by its admission to union with it as aforesaid, it became subject to all the provisions of the constitution and canons of the said church, and, both of that church at large in the United States of America, and of the said church in the diocese or State of Delaware.

And that, under and by virtue of the canons of the said Protestant Episcopal Church, in the said diocese, the charge of the property of each church in said diocese, and the regulation of its temporal concerns, are vested in the vestry of such church, consisting of the wardens and vestrymen elected according to the provisions of the said canons on Easter Monday in each year, and which fell on the eighteenth day of April, in the present year, no other day having been appointed therefor by any charter, articles of association, or by-laws of said church. That the said Christ Church, Delaware City, by virtue of the premises now is, and for several years past has been, a body corporate and politic,

in law and in fact, by the name of Christ Church, Delaware City, that is to say, at Delaware City, in the county aforesaid ; and that Kensey John Stewart, Henry W. Bigger, Everett Von Culin, Clayton Von Culin, Isaac Hunter, and Mark M. Kirby, all late of Red Lion hundred, in said county, for the space of thirty-five days now last past, and more, without any legal warrant, grant, or right whatsoever, have used and exercised, and still do use and exercise, the office of members of the vestry of the said corporation, to wit, at Red Lion hundred, in the county aforesaid, that is to say, the said Kensey John Stewart and Henry Bigger have each of them used and exercised, .and still do use and exercise, the office of wardens of the said corporation, and the said Everett Von Culin, Clayton Von Culin, Isaac Hunter, and Mark M. Kirby, have each of them used and exercised, and still do use and exercise, the office of vestrymen of the said corporation, to wit, at the hundred and county aforesaid, and that the said Kensey John Stewart, Henry Bigger, Everett Von Culin, Clayton Von Culin, Isaac Hunter, and Mark M. Kirby, for and during all the time last above-mentioned, without any legal warrant, grant, or right whatsoever, at the hundred and county aforesaid, have claimed, and still do claim to be members of the vestry of the said corporation, and each of them hath claimed, and still doth claim, to be a member of the vestry of the said corporation, and to have, use, and enjoy all the liberties, privileges, and franchises to the office of members of the vestry of the said corporation belonging or appertaining, which said offices, liberties, privileges, and franchises they, the said Kensey John Stewart, Henry Bigger, Everett Von Culin, Clayton Von Culin, Isaac Hunter, and Mark M. Kirby, for and during the whole time last above-mentioned upon the said State, usurped, and still do usurp, and each hath usurped, and still doth usurp, that is to say, at the hundred and county aforesaid, to the great detriment and damage of the said corporation, to the abuse of the rights, privileges, and franchises of the said corporation, and against the peace and dignity of the State.

To this the defendants pleaded as follows : That at an election held in accordance with the constitution and canons of the

State ex rel Dunlap et al *v.* Stewart et al.

Protestant Episcopal Church of the State of Delaware, on Easter Monday—being the 18th day of April, A.D. 1881—they were legally and canonically elected as the wardens and vestrymen of said Christ Church, Delaware City, the said Christ Church being a congregation or parish of the said Protestant Episcopal Church in the diocese of Delaware, in this, to wit: 1. That the said election was held on Easter Monday, being the 18th day of April, A. D. 1881, as is prescribed by canon eleven of the Canons of the Protestant Episcopal Church of the State of Delaware. 2. That the said election was opened in the usual and due form, and remained open for a time longer than had been usual in that parish, and that several times before the said election was closed proclamation was made by the chairman of the parish meeting for persons who had not voted to come and vote. 3. That the said election was held in Christ Church building or edifice. 4. That all the persons who voted at said election for the defendants for the offices of wardens and vestrymen were legally and canonically qualified as voters in accordance with the second section of said eleventh canon of said Protestant Episcopal Church of the State of Delaware. 5. That the said defendants received all of the votes cast at the said election for the offices of wardens and vestrymen of said Christ Church, Delaware City. 6. That the said defendants received at the said election the largest number of votes cast at said election for the offices of wardens and vestrymen of said Christ Church, Delaware City, and thereof they put themselves on the country.

On the case coming up for trial the counsel for the defendants asked leave of the court to withdraw the plea filed, and to enter the following plea to the jurisdiction of the court in the case, which was granted without objection on the other side.

And the said defendants in their own proper persons come and say that this court ought not to have or take further cognizance of the action aforesaid, because they say that neither at common law, nor by virtue of any act of assembly of the State of Delaware, can this court, or any other court of the State of Delaware, maintain any action at any time, present or future, in the name of the State of Delaware, with or without relators,

State ex rel Dunlap et al *v.* Stewart et al.

in respect of the supposed course of action in the said information in the nature of a writ of quo warranto mentioned; and this the said defendants are ready to verify; wherefore they pray judgment whether this court can or will take further cognizance of the action aforesaid, and which was signed and supported with the names and the affidavit of the defendants to the truth of it in the usual form, and issue was thereupon taken on it.

*Whitely* for the defendants. Proposed in the first place to discuss the question involved in the plea to the jurisdiction of the court in the case, and for which he might safely say, without fear of contradiction, there had never been before any precedent in this State. The writ of quo warranto was originally at common law a prerogative writ purely, never issued or prosecuted except in the name and at the suit of the king, and never at the suit of a private person or any number of them, or for the vindication of a private or personal right merely in any instance whatever. And such was its character until the statute of 9th Anne was enacted, and that was solely for intrusion into such municipal corporate offices as are mentioned in it, or for individuals claiming to exercise a public office or franchise. High on Extraordinary Remedies, §§ 592, 594, 597, 602, Appendix A, 585, 589; Statute of 9th Anne, § 4; 1 Wm. Black, 93; High on Ex. Rem., §§ 620, 623, 624, 625, 626; 17 Ad. and El., 149 (79 E. C. L., 149); §§ 5, 11 canon of the church in question; Morgan *v.* Rose, 22 N. J., 583. And that case was so ruled on the ground that the writ had never been granted in England in any church case whatever, notwithstanding a constitutional union exists there between the church and the State, and the king, by virtue of it, is the recognized head of both. King *v.* Daubigne, 2 Str., 1196; King *v.* Sheppard, 4 Tr., 381; Darley *v.* Queen, 12; Clk. *v.* Finelle, 519; 2 Sel. N. P., 1099, 1102; 1 Str., 394, 582, 639; 2 Str., 952, 1090, 1109; 1 Burr, 292; 4 Burr., 2135; 1 T. R., 453; 2 Tr., 484. These cases all show that in England the remedy sought in this case is applicable to public offices and to public officers only. In the opinion of Littledale,

State ex rel Dunlap et al *v.* Stewart et al.

J., in the case of the King *v.* The Rector and Wardens of Birmingham, 34 E. C. L., 150, it was held that this remedy by information in the nature of a writ of quo warranto did not lie in such a case as that, because it was not a case of usurpation upon the rights and the prerogatives of the crown.   30 E. C. L., 30, 222, 464; 55 E. C. L., 945; 21 E. C. L., 104; 2 Kent's Com., 224.   I admit that a bank or a railroad company incorporated by a public act of the legislature for the transaction of such business as they are authorized by their public charter to conduct, is subject to this process in our State.

The statute of 9th Anne is not, and never has been, in force in this State or country.   1 Kent's Com., 544; 2 Dal., 394; 7 Pet., 676; 1 Dal., 67; 15 S. & R., 73, 127.   And if that statute is not in force in this State, what status can this case have in this court, and where do the plaintiffs stand, or can stand without it? There were no relators in such cases prior to the statute, and that was because this process was always instituted by the attorney-general, and was used only for a usupation of, or for an encroachment upon the rights, prerogatives or franchises of the king.   High on Ext. Rem., §§ 591, 598, 600, 602; Aug. and Ames on Cor., 470; 5 Mass., 231.   But the State of Massachusetts had a statute on the subject of informations in the nature of a writ of quo warranto enacted as early as the year 1782, and the State of New York also had a similar statute, while there is a constitutional provision on the subject in the State of Missouri.

*Bates (Higgins* with him) for the plaintiffs.

The position of the relators here is not of their own seeking. We came at the instance of the chancellor whose jurisdiction we first invoked to protect a trust.   The jurisdiction is one of the utmost importance and ought to be sustained if possible to do so.   The nature and origin of the jurisdiction invoked is defined in High, § 591.   It succeeded the ancient writ of quo warranto, and the object of both is identical.   High, § 592; Darley *v.* Reg., 12 Cl. & Fin., 535.   The history of the jurisdiction is well stated in High, chap. 13, at the beginning of the

State ex rel Dunlap et al *v.* Stewart et al.

subject of quo warranto. The object of the ancient writ was to inquire, in the name of the king, of one who usurped or claimed any *office*, franchise or liberty of the crown, by what authority he supported his claim, in order to determine the right. It was also used to correct the *misuser* or the *non-user* of a franchise. High, § 592; Com. Dig. Tit. Quo War., A; 3 Black. Com., 262. The use of the writ itself is very ancient, and the first recorded case in 9 Rich. I., A.D. 1198, was, it is worthy of remark, in view of the character of the argument on the other side, against the incumbent of a church, calling on him to show by what warrant he held the church. High, § 593; C. J. Tindal in Darley *v.* Reg., 12 Cl. & Fin., 557.

The jurisdiction was never founded upon statute, but was essentially one of the common law, and the course of the statutory provisions on the subject has been restrictive and not to enlarge the jurisdiction. High, § 594. The statute of Gloucester, 6 Edw. I., A.D., 1278, gave no jurisdiction, but provided only for a delay in the proceedings. Its purpose was the redress of the subject against whom proceedings had been taken at common law. High, §§ 594–595. The result was to establish a definite judicial tribunal in lieu of one created by the crown for occasion. *Ibid.* Grievances still remaining unprovided for were sought to be corrected by the statute 18 Edw. I., A.D. 1290, known as the statute *de quo warranto novum.* It expressly recited as the occasion of its passage, its *raison d' etre*, the delays which had been experienced in proceedings in quo warranto, and provided for the relief of the subjects in several particulars. These were the adjournment of the proceedings to a day certain, the establishment of franchise, etc., by those who could not show seisin, according to the custom of the realm, and the trial of the causes on the circuits, and that causes then pending should be adjourned into their shires until the coming of the justices. Under this statute many franchises were established by prescription, and its general effect was a concession by the sovereign to the subject. High, § 597.

So far then from being the origin of the jurisdiction as is often erroneously stated, these statutes were in fact regulations of an

State ex rel Dunlap et al *v.* Stewart et al.

*existing jurisdiction.* *Ibid.,* § 598 ; Angell & Ames on Corpus, § 735.

The proceeding by information was itself a common law remedy, of an early date. High, § 599 ; Ch. J. Tindal says the practice is very ancient. Darley *v.* The Queen, 12 Cl. & Fin., 537. The first case reported was in 10 Will., III. King *v.* Mayor of Hertford, 7 Ld. Raym, 426. This case being that of the mayor of a *municipal* corporation, it is to be observed that it antedates the Stat., 9 Anne. In Darley *v.* The Queen are enumerated at p. 537 many cases in which the information was used, among which are " claiming to be a corporation, etc." The process of filing informations then took the place of the ancient writ and the latter fell into disuse. Both the exact time and the true reason of this substitution are not altogether certain. Hale and Coke agree in fixing the time as that of the abolition of the circuits in Eyre, while they differ as to when that was done. Hale fixing it about 10 Edw., 3 and Coke as late as 16 Rec. II. While Blackstone attributes the change to the length of process upon the original writ, and the character of the judgment. High, § 599, 600 ; 3 Blk. Com., 263.

High adds, as another possible reason, the criminal character of the old remedy resulting in a fine against the usurper, as well as in a judgment of ouster. High, § 600. But it is clear upon all the authorities that the substitution of the proceeding by information for the ancient writ long antedated the statute of Anne. High as before cited ; Darley *v.* Queen, 12 Cl., 1 Fin., 538.

The effect of this statute and that of 4 and 5 Will. & M. is clearly and definitely settled to have been regulation of an existing jurisdiction, not the origination of a new one. Darley *v.* Queen ; Buller, N. P. The principal effect of the statute of Anne by judicial construction is the introduction of the element of judicial discretion. Darley *v.* Queen. In fact Angell & Ames set forth three kinds of quo warranto. 1. The ancient writ. 2. Informations at common law. 3. Informations by leave of the court under the statute of Anne. Ang. & Ames, on Cor., § 732.

In England the variety of cases is endless, but that it will lie

State ex rel Dunlap et al *v.* Stewart et al.

for cases of usurpation of a corporate office is indisputable upon authority. Darley *v.* Queen, 2 Cl., 1 Fin., 539. A charter in England was a grant from the Crown; in Delaware it is an act of incorporation constitutionally passed by the General Assembly. Darley *v.* Queen establishes in the House of Lords upon a review of authorities from 9 Rich. I. to 1845, two classes of cases to which the remedy applies. 1. Offices granted by charter—no distinction being drawn between so-called public and private charters. 2. Offices created by law (but not under a charter) when such office is of a public nature. This must be accepted as the law of England. What is the analogy in the American States? 1. Offices created under acts of incorporation of whatever nature or for whatever purpose. 2. Offices created by the Constitution or by Act of Assembly, though not corporate offices when of a public nature. These two classes of offices are recognized as the subjects of the remedy by High in his treatment of the subject, chapters 14 and 15.

3. There is no such distinction as contended for between officers of corporations of a public and private nature. The distinction between public and private applies to *offices* created by law, but not corporate, and not to offices of chartered corporations. Darley *v.* Queen, High, ch. 15.

The very distinction contended for as between public and private corporations is a false one.

It has been repudiated by the Court of Appeals of this State. Bowers *v.* P. W. & B. R. R. Co., 4 Houst., 506. Our statute law distinguishes between public and private charters, and that distinction is conclusive in the courts. It was admitted by the other side that the jurisdiction invoked would apply to the case of a bank, railroad company, etc. In that he admits away his whole case. Banks, railroad companies, insurance companies and the like are not incorporated for the purpose of giving them powers not exercisable by individuals, but for the same purposes as religious societies. Substantially it was admitted that when there was a franchise misused the right existed.

A corporation is itself a franchise. Com. Dig. Tit. Corp., F., 1; Darley *v.* Queen. The *franchises* granted (except eminent

State ex rel Dunlap et al *v.* Stewart et al.

domain) are alike in all cases,—to be a corporation,—to have succession, to use a common seal, to hold real estate so as to make it personal property, to limit the individual responsibility of the stockholders or members, to fuse many into one compact convenient entity adapted for the union of interests, to sue and be sued as a single person. The purpose in all cases is as expressed in the citation made on the other side from Kent "to enable congregations (aggregations of persons united for a single business purpose) more easily to manage their temporalities." The authority to worship God is not given by the act of assembly, but the corporate powers to a religious body are the same as those with which any other is endowed. If, as contended, the statute of Anne is the fountain of power, municipal corporations alone are affected by the right to issue quo warranto informations. But it is admitted that the right exists in this State in the case of banks—hence either the statute of Anne exists in this State and by admission extends beyond municipal corporations, or it does not exist in this State, and without it there is an admitted jurisdiction in the case of banks, etc.

Then here as to the argument *ab inconvinienti*, that the exercise of jurisdiction in the case of a church involves the court in multifarious trivial matters relating to petty corporations. Just here is the function of the discretion of the court which grants leave to file the information only in proper cases. Better even the chance that the attention of the court may be occupied by trivial cases than the utter failure of justice from the lack of a proper exercise of this jurisdiction. But there is no such trouble to be apprehended since the application of the remedy is limited by the discretion of the court to proper cases. That discretion has been exercised—it was properly exercised—the court can rest on it. No interests are more important to the well being of society. None more bound up with the public welfare in its largest sense. It is provided for by the public law of the State, passed at nobody's request, as an ordinary charter, important enough to be incorporated into the revised public statutes of the State. It affects not this corporation merely, but all those existing under this law. There is no middle ground; they

State ex rel Dunlap et al *v.* Stewart et al.

must contend either that this remedy applies only to municipal corporations, or that it does apply to this case. No middle ground can be found which can be rested on any principal. Test this by seeking to formulate the rule as to public and private corporations contended for by the counsel on the other side. It cannot be done. It is a mere arbitrary assertion that some things are important and some not. As to the importance of the objects of this corporation we take issue with him.

The jurisdiction in England has been stated as necessarily applying upon principle to all corporate offices. But in this country, it is much more extensively applied and is regarded as the appropriate remedy for unlawful intrusion into offices of both private and public corporations. High, § 653. How stand upon authority the particular class of corporations now under consideration?

In England the authorities are very meagre, but lead to these conclusions. In Rex *v.* Dawberry, 2 Str., 1196, an application for leave to file an information in a case of church wardens was refused, but with no reasons given. The language of the report, however, tends rather to the conclusion that it was refused not for want of power, but as an exercise of discretion. In King *v.* Shepherd, 4 T. R., 381, Ld. Kenyon expressed the opinion that it would not lie, and such seems to have been accepted by some authorities as the rule. But the reason for refusing there is one which does not apply in this country. It must be observed that the opinion is confined to wardens and does not include vestrymen who are the only purely lay trustees—wardens having spiritual functions. The exclusion of wardens from this remedy, if it existed, was based upon the fact that another and a summary ecclesiastical remedy existed. Grant on Cor. (80 Law Lib.), 604. That there was such a remedy there is abundant authority. *Ibid.,* 604, and authorities cited. Com. Dig. Tit. Eszlin F. 1, F. 2.

Church wardens in England are not corporations, but are termed *quasi* corporations. Grant on Cor. (80 Law Lib.), 600, 603; 1 Burns Eccl. Law, 377. But it was held by Lord Denman, in Rex *v.* Birmingham, 7 A. & E., 257, that there was no

civil remedy.   The allusion in Darley v. Queen by the House of
Lords to church wardens as a case in which the remedy had been
refused is *obiter dictum* and, as shown by the authorities, does
not give the true reason of refusal in Rex v. Dawberry, and is
in conflict with the principle afterwards laid down by the House
of Lords in the same case.   The English cases of Rex v. Rector
and W., of Birmingham, 7 A. & E., 254, and Rex v. Ramsden,
3 A. & E., 455, which were cited on the other side " as con-
clusive," to use his own expression, are practically overruled by
the House of Lords in Darley v. Queen.

In this country the doctrine is settled that it is a proper
remedy in cases of usurpation of trustees of incorporated church
association.   High, § 664; Com. v. Woelper, 3 S. & R.; Com.
v. Cain, 5 *Ibid.*, 510; Com. v. Arrison, 5 *Ibid.*, 127; Com. v.
Graham, 64 Pa. St., 339; State v. Farris, 45 Mo., 183.   It is
not material to this argument whether the statute of Anne be
regarded in force or not.   Probably it is not.   In Union Church
v. Sanders, it was assumed in argument that it had been so de-
cided in State v. Wil. Bridge Co., 3 Harr.

The fact that the common law remedy exists in this State is
beyond question.   It is so admitted by the other side, and it is
a necessary implication from Union Church v. Sanders, 1 Houst.,
100, that mandamus will lie in case of religious corporations.
Mandamus is of like origin with quo warranto, and yet it will
hardly be contended that mandamus would not lie to the officers
of what have been called here private corporations.   Yet from
the same source comes that jurisdiction for which we contend,
and the statute of Anne has the same relation to mandamus as
to quo warranto, with respect to the character of the corpora-
tion.

Mr. Whiteley referred to Sanders' case as dismissed because
there was no estate.   Here, then, is no question as to the estate
of the trustees.   There is absolute power of sale of the property
under the act, and subject only to possible relief in equity against
an abuse of trust as in N. J. case cited.

*Comegys*, C. J.   The question so ably discussed by the coun-

State ex rel Dunlap et al *v.* Stewart et al.

sel on both sides as to the nature and extent of this court's juris-
diction in cases of quo warranto, now formally arises in this
State for the first time, and it is a matter of regret to us that the
necessity for deciding it promptly on this occasion, prevents that
thorough research into the origin, history, and exercise of the
remedy which we should prefer to make. But whatever they
may be, it is not to be doubted that so far as the common law of
the writ is concerned, it has always existed in this State, as in
England, and the mode of proceeding in the exercise of the
remedy accompanied it, so far as the same was applicable to one
condition whilst we were a colony of the British Crown; and
still exists, though we are no longer such. It may be safely
affirmed that the whole body of the common law, both of right
and remedy, was brought hither by our ancestors on their emi-
gration from England, as part of their heritage of liberty which
they had received from them, so far at least, as any of it suited
their changed condition. Much of it, no doubt, lay dormant for
a long period, no occasion or demand for a resort to such por-
tions of it for any purpose having arisen, but gradually as the in-
creasing population of the new country begot new relations,
there arose controversies and contests growing out of the busi-
ness in which they engaged, and the necessities for the redress of
injuries which resulted from the breach of loyal duties or the
non-performance of loyal obligations that called for the use of
the means to enforce observance through the ancient remedies.
The common law of charities had so long lain dormant that none
knew just what it was, most judges and lawyers supposing that
there was no such law in respect to them, but that the jurisdic-
tion over them was solely derived from the well-known Statute
of Elizabeth in regard to them, until the researches of the crown
commissioners into the subject developed the fact that it created
no new law on the subject, but only established a statutory mode
to protect them and carry them into effect. And the great case
of charities arising under the will of Stephen Girard called forth
all the powers of research and investigation of a great Philadel-
phia jurist into the common law on that subject prior to and
independent of the statute, which together with the decision in

State ex rel Dunlap et al *v.* Stewart et al.

that case placed it on a foundation which was afterwards recognized by the Court of Appeals of this State in a decision in the Potter Will case not likely ever to be shaken. The common law on that subject had slumbered unknown to the profession until the former case was argued and adjudicated, and but for that decision it would probably have remained in the same condition until the present time. Similarly the law in regard to quo warranto had never been evoked and passed upon in this State, so far as any decision in our courts on the subject is concerned, until the institution of the proceedings in the case now before us, though it had existence in the womb of the common law before the time of the Crusades, although never appearing upon the statute books, as aided by parliamentary provision for its exercise, until the time of the first Richard.

Whatever the common law of the writ was, as to its function, it was part of that vast mass of remedies for wrongs which was brought over by the first English settlers here, and here it has remained from that period to the present, ready at any time to be called into action, but comparatively an unknown, and certainly an unused muniment of our system of civil judicature. Unlike the statute law the ancient common law never expires from non-use or desuetude, never becomes obsolete; but when the occasion occurs for a resort to it, it arises from a slumber however long, as vigorous and efficient, with all its remedies at hand for the enforcement of it, as if it were in daily use, though some of the means of setting it in motion may be unsuited to the changed condition of the population here, yet there is always enough of them to make its influence efficient, for the elastic nature of the general common law system is found to be equal to the production of any method that may be required for any occasion. Circumstances were constantly arising from the multifarious pursuits and engagements of the English people that produced wrongs or liabilities for which the accustomed legal machinery furnished no remedy, but the ingenuity of the courts operating upon their elastic system of jurisprudence soon found a form of action suited to a matter of judicial cognizance where none existed before. We have a striking illustration of this ability to pro-

State ex rel Dunlap et al *v.* Stewart et al.

vide new or better remedies under that system, in the action on the case. So also from the time of Richard the First, and from the time of the general call by Edward the First upon all who were exercising any franchises without authority to surrender them, until the passage of the statute of Gloucester in the sixth year of his reign, and of the succeeding statute in regard to the same matter in the eighteenth year of his reign, and also even, down to near the time of the passage of the statute of Anne on the subject, the writ of quo warranto was the only process by which usurpers of such privileges could be brought before the courts and made to show by what authority they claimed to hold and exercise them. But the creation of corporate bodies by charters, until then rarely done, and the enactment of acts of incorporation by Parliament having become more common, and the claim of right to offices respectively created by them, set up by persons other than those who were justly entitled to them led to the enactment of the statute of Anne on the subject, to relieve the crown from the necessity of becoming the actual party plaintiff in the writ when no strictly public interest was concerned in the proceeding, and to place the power to employ it with the consent of the Court of Kings' Bench, in the hands of a private person. It did not, of course run in the name of such private person ; but to retain the form and preserve the symmetry of the system of remedy as it had before existed, the writ was issued and the proceeding was conducted as before in the name and on behalf of the king, the ground and motive for it being the formal information of such private person or persons seeking the benefits of the remedy filed in writing and supported by their affidavit to the truth of the facts alleged in it.

Such was, in brief, the plan and system of the remedy and proceeding in England when and after the statute of Anne was passed, and when, at a later day, the colonial legislature of this State proceeded by statute, as early as the year of 1736, to establish and define the jurisdiction of the courts of law and equity within what was then legally styled the Government of the Counties of New Castle, Kent and Sussex upon Delaware, and conferred general civil jurisdiction on one of the common law

tribunals provided for in the statute, in the following terms: "A competent number of persons shall be commissioned by the governor, or his lieutenant for the time being, under the broad seal of this government, who shall hold and keep a court of record in every county of this government, which shall be styled and called the county court of common pleas, which justices, or any three of them (according to the tenor and direction of their commissions), shall hold pleas of assize, *scire facias,* replevins, informations and actions upon penal statutes, and hear and determine all and all manner of pleas, actions, suits and causes, civil, real, personal and mixed, according to the laws and constitution of this government, as fully and amply, to all intents and purposes, as the justices of the king's bench, common pleas and exchequer in England, or any of them, may or can do." Laws of Delaware, 1 vol., 121, 122; Dig. of 1829, 101, 102. And this provision of that statute was in force when the first constitution of the State, as an independent government, was afterwards formed and adopted on September 20, 1776, which in one of its articles provided as follows: "The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the legislature, such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, etc., agreed to by this convention." Art. 25, Delaware Laws, vol. I., Appendix, 89. The declaration of "Rights and Fundamental Rules of the Delaware State" referred to in the conclusion of the article just stated had been previously framed and adopted by the convention on the 11th day of the same month before mentioned. *Ibid.,* 79. And there will be nothing found in it repugnant to the meaning and spirit of the foregoing article of the constitution so far as the proceeding now before us is concerned. And that court continued in existence, and that provision of the statute remained in full force, not only under that constitution, but also under the succeeding constitution of 1792, and under the general revision and republication of the statutes of the State in the Digest of 1829,

State ex rel Dunlap et al *v.* Stewart et al.

down to the adoption of our present constitution in 1831, by which that court and the judiciary system till then established was abolished and our present system was substituted, but in which the framers of it saw proper, without any precedent for it in either of the preceding constitutions, to incorporate the following express provision in creating the present superior court of the State as a substitute for the court of common pleas and the supreme court under the two former constitutions, and in defining the jurisdiction of it, viz. : "This court shall have jurisdiction of all causes of a civil nature, real, personal and mixed, and all other the jurisdiction and powers vested by the laws of this State in the supreme court or court of common pleas." Constitution of 1831, art. 6, 3; § Revised Code of 1852, p. 31. Whilst in that general revision and re-enactment by the legislature of the statutes of the State in the year 1852, defining the jurisdiction of our present superior court, the original provision of the early statute, hereinbefore first referred to, was expressly re-enacted and republished in that year in its original and identical terms almost, and which is as follows : "The judges of the superior court, or any two of them, shall hold pleas of assize, *scire facias*, replevins, informations and actions on penal statutes, and hear and determine all and all manner of pleas, actions, suits and causes, civil, real, personal and mixed, according to the constitution and laws of this State, as fully and amply, to all intents and purposes, as the justices of the king's bench, common pleas and exchequer in England, or any of them. may or can do." Revised Code of 1852, chap. 92, § 1, p. 317. And the same is still in full force and effect, as it has never been repealed or abolished under any change in the constitution of the State, or altered or modified in any manner whatever since its re-enactment substantially by the legislature in 1852.

It will be observed that the jurisdiction conferred by the statute includes in express terms, as one of its subjects, that of informations, and in order that it may be rescued from the interpretation given to it by the counsel for the defendants, that it must be understood to refer to informations for criminal offences

only where that method of proceeding would apply, instead of by indictment, or to informations on penal statutes merely, which the context would seem more properly to warrant, as he suggested, it is only necessary to refer to the constitutional provision, article 1, section 8, which declares that no person shall for any indictable offence be proceeded against criminally by information, except in the special cases provided for in the constitution, of which this is not one; and this is the more certain from the fact that neither the former court of common pleas ever had, nor has the superior court ever had, any but civil jurisdiction or any authority to try a purely criminal offence, either by indictment or information. And, therefore, the information referred to in the statute must be such only as had assumed in the courts of England referred to, at the time of its original passage, the nature and character of a civil action, instead of a criminal prosecution, in the name of the king. And there is no doubt that the writ of quo warranto in that country was originally a proceeding of the latter character at the instance and in the name of the king against such as had usurped rights or franchises without any grant therefor from the crown, and there is also no doubt that informations in the nature of quo warranto, which afterwards became in practice uniform substitutes for the writ, were of a *quasi* criminal character, and the proceeding was substantially the same in form, though much more convenient, expeditious and less expensive than on the writ itself. The writ of quo warranto, however, never was a strictly criminal process, or applicable in the administration of criminal justice or in the prosecution of any crime or misdemeanor at common law, but it was a prerogative and extraordinary writ and remedy employed for the preservation of the rights and prerogatives of the crown in cases such as we have before mentioned, and it is certain that an information in the nature of quo warranto had practically ceased to be treated in England, notwithstanding its form, as essentially a criminal proceeding long before the enactment of the colonial statute of this State first above referred to.

Having thus disposed of the question as to the jurisdiction of the courts of this State over informations of this nature, it re-

mains to consider whether the offices, alleged in the information filed to have been usurped by the defendants, are of such a nature and such importance as to warrant the court in proceeding to take further cognizance of the case. It seems to be now the settled law in England that the offices for which this action or remedy by information, in the nature of quo warranto, will lie, must be permanent, substantive, and public, in their nature. 12 Cl. & Fin., 520. This is doubtless the law here also; but these terms have not always been considered on this side of the Atlantic to mean the same thing as they mean on the other. As to the terms permanent and substantive, there is not, perhaps, any difference in the meaning and acceptation of them, a permanent office there and here meaning one of fixed and certain tenure, and not a merely casual one, or one depending on another's will whenever exercised; and a substantive one, meaning a distinct and well-established one, with fixed and permanent duties, being not a mere employment or agency, but a place necessary in the constitution of the body in which it exists. The public nature of it may be admitted, as in England, shown by its connection with some public general trust or employment, or some modified or restricted service not appertaining to the general body politic. Public offices there seem to be those only which are a part of the apparatus of government at large, or that of municipalities or cities, towns, etc. In the case referred to, the question was, whether the office of the treasurer of the city of Dublin was such a public office as would be subject to an information in the nature of quo warranto, and it was held that it was, but upon the ground that it was an office created by an act of Parliament; and it was further held in that case that the proceeding would lie for usurping any office, whether created by charter alone, or by the crown with the consent of Parliament, provided the office be of a public nature, and a substantive office, not merely the function or employment of a deputy or servant, held at the will or pleasure of others, for, with respect to such an employment, the court certainly would not interfere, and the information would not properly lie. And here, as there, we have offices in the technical sense, of a substantive nature in the civil govern-

25

State ex rel Dunlap et al *v.* Stewart et al.

ment of the State, and of the same character in our municipal corporations, created and established by acts of our legislature, and the only way in which they can be created here; in regard to the protection of which, by such information, there could be no question; but, even much more here than there, we have a large number of such public and substantive offices, created by legislative authority in connection with its grants of corporate franchises; and surely the directors or other corporate officers of such corporations are strictly as much public officers for the management of the affairs and the transaction of the business of their respective corporations, as the mere treasurer of the city of Dublin was, or could possibly have been, for it must not be overlooked that the decision in that case was not put upon the ground that the public nature of the office in question consisted in the fact that it was a substantive office in a municipal corporation, but because it was created by a public act of parliament. It has been earnestly and strongly contended by the learned counsel for the defendants, that the wardens and vestrymen of Christ Church, Delaware City, are not public officers in the meaning of the law, nor their offices such offices, if usurped, that an information in the nature of a writ of quo warranto can be maintained in this court for the recovery of them, because it has been ruled in England, in the cases cited by him, that wardens of such a church in that country cannot maintain it for a usurpation of their offices, notwithstanding the legal and recognized union which subsists there between the State and the Protestant Episcopal Church, and the king, both in theory and in fact, is the head of the Church there. But it seems that such ecclesiastical officers in that country have no corporate rights or franchises, except such as are *quasi* merely, and besides that, there exists another and special tribunal, established in that country, which has cognizance and jurisdiction in such cases, in which church wardens are concerned, and that they have an adequate remedy in such a case before it. But here there are no ecclesiastical courts or tribunals recognized by law; the churches of all denominations here, in the absence of any legislation for the purpose, being wholly dependent on the rules and regulations of their own adop-

State ex rel Dunlap et al *v.* Stewart et al.

tion for the government and control of them in their purely eccle-siastical and religious affairs, and over which our civil courts have no jurisdiction whatever. In this State, however, we have long had a general act of the legislature, published among the public statutes of the State, entitled an " Act to enable all the religious denominations in this State to appoint trustees, who shall be a body corporate for the purpose of taking care of the temporalities of their respective congregations," and which pro-vides, in general terms, that any religious society or congrega-tion of Christians, consisting of fifteen or more persons, may be-come incorporated by the election of trustees, not less than three and not more than twelve, and taking a name and certifying the same, under the hands and seals of said trustees, to the recorder of deeds; such trustees to be elected at a public meeting of the society or congregation held at their usual place of worship, on ten days' notice by advertisement at the front door of such place, and by a plurality of votes of the members present; that the trustees so elected, and their successors, shall be a corporation, by the name so adopted and certified; shall have perpetual suc-cession, with all the incidents and franchises of a corporation aggregate, and with power to purchase, receive, hold, and enjoy property, real and personal, for the use of the said society or con-gregation, their ministers or members, or for schools, almshouses, or burying grounds; the acts of a majority of the trustees shall be valid ; other trustees may be elected, and vacancies filled by election, as before prescribed, and the election of a successor to any trustee shall remove him from office.

These are some, though not all of the material provisions of the statute referred to for the appointment and incorporation of trustees in general to take charge of the temporalities of their respective churches and congregations for the use and benefit of the same, and of the provisions of which a large proportion of the churches or religious congregations in the State have availed themselves. But the ninth section of the act, varying somewhat from the foregoing provisions, specially provides " that the rector, wardens and vestrymen of any Protestant Episcopal church, on certifying their name, or style, as before prescribed, shall be a

State ex rel Dunlap et al *v.* Stewart et al.

corporation, with the franchises, rights and powers therein vested in trustees of other religious societies." Rev. Code Amended, chap. 39, §. 9, p. 194. It will thus be seen that by one general act for the incorporation of trustees for religious societies or congregations of Christians, the wardens and vestrymen of any Protestant Episcopal church, on complying with the provisions of it, as the trustees of other churches, become a part of the corporation itself, and though strictly a private body, they are in reality a public body, for the functions in which they are engaged are public to all, and concern, as we think, more than anything else, the welfare of men. Incorporated as they are, with the franchise of legal immortality, the power of using an artificial name, taking charge of and holding in their corporate name as trustees, all the property, real and personal, of the church, and transacting all its temporal business and affairs, with power to sue, and liability to be sued concerning them, it would be, we think, a view too narrow to regard them as mere servants or agents without a substantive office or function other than such as should be considered and held to be merely private or temporary in its nature and character.

Can it be possible that relief by information in the nature of quo warranto is to be denied to such official persons if the offices to which they are entitled have been usurped by others? If there is to be no relief had in such a case before the tribunals for the administration of justice between man and man, where is all the large body of religious people of the different denominations in the State to obtain redress when persons not chosen by them according to their forms intrude into the offices of their corporate bodies? For if it cannot be found in this court, it cannot be found elsewhere. We think the power to grant the relief sought in this method in behalf of the relators is as certain as in behalf of other incorporated bodies with officers created by law to perform corporative duties; and it is not to be successfully denied at this day and in this country, we think, that corporations and corporate offices created by public statute come within the equity and the spirit of the law in regard to the remedy and proceeding in question; and in support of this

State ex rel Dunlap et al *v.* Stewart et al.

opinion we would particularly refer to the case of Commonwealth *v.* Arrison, 15 S. & R., 127, and 4 Cranch's C. C. Rep., 438.

*Houston,* J.   The decisions in England on this question have been entirely under the statute of 9 Anne, chap. 20, § 4, for they have held that informations in the nature of quo warranto could only issue in relation to such public offices as are mentioned in the preamble to the first section of it, viz. : " the offices of mayors, bailiffs, portreeves and other offices within cities, towns corporate, boroughs and places within that part of Great Britain called England and Wales ; " and it was therefore only such offices and franchises as were originally derived from the king, and were of a political and public nature, that they considered subject to their jurisdiction under the statute.   Queen *v.* Mouseley, 8 Ad. & El., 946 ; King *v.* Ogden, 10 Barn. & Cross., 230.   But by the same terms the operation of the statute was limited to England and Wales, and was therefore never in force in this or any other of their American colonies; and yet the fourth section of it contains an express recognition of the fact that such proceedings in cases of information in the nature of a quo warranto had been usual before the passage of the statute. And that may have been a less restricted practice than was afterwards sanctioned by the statute, and that may also have been the information and the practice to which our early colonial statute had reference, for it was passed only about twenty years after the statute of Anne.   But the counsel for the defendants has distinctly admitted that a different rule prevails in the States of this country and in this State in regard to it, and that it may be maintained here for the usurpation of a franchise or a corporate office of a private corporation, such as a railroad, a banking, an insurance, or a turnpike company incorporated by the legislature ; and the American cases are abundant to sustain his concession on that point ; he will find no such case, however, in England.   The nearest approach to it, perhaps, is the case of The King *v.* Nicholson *et al.,* 1 Strange, 299, in which it appeared that by a private act of Parliament for enlarging and

State ex rel Dunlap et al *v.* Stewart et al.

regulating the port of Whitehaven, several persons were ap-
pointed trustees, and a power was given to them to elect others
upon vacancies occurring in their number by death or otherwise;
the defendants took upon themselves to act as trustees without
such an election, and upon a motion for an information in the
nature of a quo warranto against them, it was objected by their
counsel that the court never granted these informations, but in
cases where there was a usurpation upon some franchise of the
crown, whereas in this case the king alone could not grant such
powers, and, therefore, they constituted no prior franchise of the
crown.   But the court granted the motion and said that informa-
tions had been constantly granted when any new jurisdiction or
public trust was exercised without authority.   That case oc-
curred eight or nine years after the passage of the statute of 9
Anne, and although it would not seem to fall within the pre-
amble of it, or within the principle of the later rulings in re-
gard to it, and the trust was conferred on the original trustees
by a private act of Parliament, it was nevertheless to be con-
sidered a public trust, because the subject of it was the enlarge-
ment and regulation of a public harbor in the kingdom.

I now come to the consideration of the corporate offices and
franchise alleged to have been usurped in this case.   The statute
of this State for the incorporation of trustees to take charge of
the temporalities of religious societies or congregations of Chris-
tians was originally passed nearly a hundred and forty years
ago, and has always been regarded as a general and public stat-
ute, and our courts have taken judicial notice of it as such.   Now,
a religious society or congregation incorporated under the statute
is purely a secular institution like any other civil corporation
created by the legislature for business purposes simply, to take,
hold and transmit in perpetuity the legal title and possession of
all the property, real and personal, of such religious society or
congregation, and has nothing whatever to do with the spiritual,
religious or ecclesiastical affairs or concerns of it, and as such
they have nothing to do with the control or management of the
church or congregation in the great object for which it was
founded, the worship of God and the salvation of the souls of

State ex rel Dunlap et al *v.* Stewart et al.

men.  But one of their first and highest duties under the statute, after  they have  thus  been  incorporated,  is to  see that their  corporate existence is properly continued and perpetuated according to the design of  the statute,  by the  due  and  regular election of their successors in office in accordance with the rules and regulations of the society adopted for that purpose.    The object of the statute in  requiring  their incorporation  to be  recorded in the office  of  the  recorder of  deeds in  the  county was  to  give  the greatest  practicable  publicity to  it, and  in  this way to furnish record  evidence  of  it  accessible  to  all, and when we  consider that in these corporations  is vested the legal title and possession and the care and management of all the property, real  and  personal, of their respective churches or congregations, and that no one can sue or be sued in any action at law for or concerning it, or any part of it, but the corporation by its name, and that such societies are already very numerous and are constantly increasing in the State, and  continue  from generation to  generation, and rarely ever  die, although  the  individual  members of them  are continually changing, and  could not securely hold  the  immense amount of  real estate alone which they now enjoy in  the aggregate  throughout this  State without  the  intervention of such a body politic having perpetual succession, we can readily perceive the wisdom and propriety of its enactment for those strictly legal and  equitable  objects.    And viewed in  this aspect as a body politic incorporated for the sole purpose of taking charge of their real and personal property, and the conduct and management of their  temporal affairs merely, why  should  such  a corporation differ in legal principle from any other  private  corporation created  by the legislature for a similar  purpose, such as a railroad, a turnpike, a bank, or an insurance company, or any one of the many municipal  corporations of the towns and villages in  the State made by the  legislature  in the last few years?   And yet counsel for the defendants has distinctly admitted  in  his argument that an information in  the nature of a quo warranto can be  maintained here  for  the  usurpation of a corporate office or franchise in any such corporation as I have just mentioned.

The preamble to the original act clearly discloses that it was

State ex rel Dunlap et al *v.* Stewart et al.

the design of the legislature to secure the churches and the real estate to the denominations of Christians which had procured the land and erected them, and that they should continue to own and control them by a good and available title in a court of law; and although it was enacted, as I have before remarked, nearly a hundred and forty years ago, it has never been repealed, but has been re-enacted without essential alteration in the code both of 1829 and of 1852. It would, therefore, seem to be altogether too late now to raise the question in our courts whether such a religious society or congregation of Christians constituting a corporation aggregate in law has no action or no legal remedy or relief for the unlawful seizure of all its property, real and personal, and the entire usurpation of its corporate franchise, or of any of the offices existing in the society for the administration of its temporal affairs and concerns merely, as is solely the case with the offices of wardens and vestrymen in the religious society now in question. By the constitution and canons of the Protestant Episcopal Church they have charge of the temporal concerns of their respective churches, among which is that of the oversight of the temporal government of it, attending to the annual elections of the vestry and employing ministers, etc., and by virtue of the same the wardens and vestrymen are to be elected by a plurality of votes of the members of the congregation duly qualified to vote for them by another canon of the church, on Easter Monday in each and every year, and who are to continue in office for one year, or until their successors in office shall be duly elected. Now, it is apparent, if the entire office of the vestry in one of these churches may be usurped without impunity, and without any legal remedy whatever to recover it on the part of those lawfully entitled to it, and who have been wrongfully dispossessed of it, the congregation and the denomination may as effectually and completely lose the church and all its property, and all the temporal uses and benefits of the incorporated trust created by the statute, as if the same were seized and wrested from their possession and control of the incorporated trustees themselves by an equal number of

absolute trespassers, while the former would be no less at variance with the design of the statute than the latter would be.

But we are not without American cases of high authority directly on the point presented in this case, and the first I shall refer to is, Commonwealth *v.* Woelper and Others, 3 S. & R., 29, which arose in the adjoining State of Pennsylvania several years before they had any statute in that State in relation to informations in the nature of a quo warranto, and no other law in regard to them than the common law which they had derived from England, and which was very similar to the case now before us, heard at nisi prius before Gibson, J., and verdict rendered for the Commonwealth, and afterwards on a motion for a new trial before Tilghman, C. J., Yeates, J., and Gibson, J., it was refused, the court being unanimous. It was an information in the nature of a quo warranto for usurping the office of vestryman of the corporation called The Ministers, Vestrymen, and Church Wardens of the German Lutheran Congregation in and near the city of Philadelphia, in the State of Pennsylvania. The case of the Commonwealth *v.* Arrison and Others, 15 S. & R., 127, arose several years later, but also before any statute had been enacted in that State, and which was also in principle the same as the case now before the court. It was also on information, in the nature of a quo warranto against the defendants for acting as the trustees of an incorporated religious society in the city of Philadelphia. The case was fully and elaborately argued, by able counsel on both sides, and was as maturely considered in a very able opinion of the court delivered by Tilghman, C. J., that the information in such a case would lie in that State, although he admits he could find no case of the kind either to sanction or condemn it in England. And this last case has been long since fully recognized, and approved by the court in that State in the case of the Commonwealth *v.* Graham, 64 Pa., 339. State *v.* Ferris, 45 Mo., 183, is also an authority on this point.

And when we consider that the ancient and original writ of quo warranto, which had been superseded by an information in the nature of it prior to the statute of 9 Anne, was the peculiar and appropriate remedy for the usurpation of a royal franchise,

and was a prerogative writ which, originally, issued only at the suit of the king himself to vindicate his prerogative against such encroachments or usurpations, and that it was even doubted by the legal profession in England, down to a comparatively recent period, that an information in the nature of it would not lie for the usurpation of a franchise granted by a public act of parliament, although it was the act of the king, as well as of parliament, we cannot fail at once to perceive that no such royal or executive attribute ever could have attached to the remedy as it was adopted in any of the colonies or States in this country, because, from the beginning, the legislature here had the sole and exclusive power of granting corporate franchises or creating corporate officers; and therefore, it neither has been, nor should it be, confined in this country to the same class of cases to which it is now limited in that country under the statute of Anne.

As this, then, is an incorporated trust, created by a general act of the legislature to hold the property, real and personal of the said religious societies or congregation, to take charge of its business affairs and temporal concerns merely, and, as by the law and practice of this church, and churches of that denomination, it is the province and duty of the vestry to attend to the temporal concerns of it, and, among these, to see that the annual elections of their own bodies are duly attended to, and are conducted in a lawful and proper manner, and as their allegation is that these important temporal offices, thus held by them in the church and in the said corporation, has been usurped by the defendants, I must say, after the best consideration which I have been able to give to the subject, that I am satisfied that it is in the power and discretion of the court to grant an information in the nature of a quo warranto in this case, for the purpose of redressing the temporal injury and usurpation alleged by the relators, and that the court ought to grant it.

As the case was now before us on a plea to the jurisdiction of the court, the judgment should be respondeat ouster.

The plea before withdrawn was then re-entered in behalf of the defendant, and the next question that was presented in the case

State ex rel Dunlap et al *v.* Stewart et al.

was, whether it should be tried on the issue now joined before the court, with or without the intervention of a jury.

*A. Harrington* for the plaintiff. The counsel for the State were willing that either mode should be adopted as might seem best to the court, but this is not a case for a jury trial necessarily, for a trial by jury is not a right of either party in a case of this kind, but it is a matter resting entirely in the discretion of the court, is grantable *ex gratia* merely, and the court may if they see proper, direct an issue of fact to be framed and tried before a jury in such a case, for its own information on any question or questions of fact involved in it. High's Extraordinary Legal Remedies, § 740 ; 4 Wis., 567 ; 26 Ark., 281 ; 5 Kan., 213 ; 53 Mo., 97 ; 55 Barb., 344 ; 9 East, 252.

*The Court* stopped *Whitely* in reply and directed a jury to be empanelled to try the case.

On the trial before the jury the original incorporation of the trustees of the church in question pursuant to the provision of the statute, and also the constitution and canons of the Protestant Episcopal Church in the diocese of Delaware prescribing the time, place and manner of holding annual elections of wardens and vestrymen, and the qualifications of voters therefor at such elections, were put in evidence on behalf of the State, and from which it appeared that Easter Monday in every year was the day thereby appointed for the annual election of them, and that they were to continue in office until the Easter Monday ensuing, or until their successors should be duly elected. And it was also proved that the relators had been duly elected the wardens and vestrymen of it on Easter Monday, 1880, and had performed the duties of their offices up to the time when the alleged usurpation of it by the defendants occurred. Dissension had, however, in the meantime occurred between them and the rector of the church, which resulted in an application by them and a large number of the communicants of the church to the bishop of the diocese that his relations to the church as rector of it might be terminated, and which on consideration by him and

State ex rel Dunlap et al *v.* Stewart et al.

the standing committee of the diocese pursuant to the canon of the church in such cases, was favorably entertained, and he was accordingly duly notified by the bishop that his relations to the church as rector of it would cease at midnight on the following Easter Sunday, April 17, 1881. Notice of the annual election of wardens and vestrymen at the church on the next day, Easter Monday, April 18, 1881, had in the meanwhile been given in the usual manner preceding such elections in the church ; and by 10 o'clock on that day a full meeting of the congregation had assembled in the church for that purpose, all the wardens and vestrymen being present. A table and chair by their direction had been placed below the chancel for the accommodation of the chairman of the meeting and the voters at the election, but the rector walked up and stood before the chair and between it and the table, as soon as the secretary of the vestry had called the meeting to order for the purpose of proceeding to the election, and had made and put the motion on its being seconded by another vestryman, and pronounced it carried that Capt. Charles Corbitt, should be chairman of the meeting, who then immediately arose from the pew in which he was seated, and proceeded towards the chair and table to take his seat in accordance with it, but on his approaching them the rector still standing retained such a position between him and them that he was unable to take the chair without rudely forcing him from it which he forebore to do out of respect for the place and the congregation assembled, but remained also standing near the chair and table facing the congregation, and immediately announced that he had been elected chairman of the meeting and had accepted the position, and intended to be chairman of it. A motion was then made and seconded that Mr. Charles G. Ash should be the secretary of the meeting which was put to vote by the chairman, and was pronounced carried by him. The rector who was then standing behind him exclaimed " this is illegal," when he, the chairman, drew from his pocket and commenced reading to the meeting a reply received from the bishop to certain inquiries addressed to him by the vestry in regard to the proper persons to hold the annual election of wardens and vestrymen, to judge and decide

State ex rel Dunlap et al *v.* Stewart et al.

the qualification of voters, and as to the right of the members of the parish to choose the chairman to preside at a parish meeting, whereupon a great uproar arose on the part of the rector's adherents in the meeting, and the disorder and tumult only increased as he persisted in his efforts to read it loud enough to be heard, until the rector abruptly took the chair at the table and called aloud on the meeting to come up and vote quick, when a number of his party hurried forward in a body and in great confusion to the table, and as rapidly as they could, deposited their tickets in the box which had been improvised for the emergency, and in a few moments the work of voting was over on their part, the residue of the meeting abstaining from any participation in it. No list of voters was called by any one, and none was taken of the names of those who voted, and the votes with the assistance of the rector were put in the box so fast and in such confusion that it was impossible to tell who voted. In the crowd at the table and around the box there were men, women and children, and the treasurer of the church whose duty it was to keep the list of all the members of it in a book testified that not more than nine of them who voted were entitled to vote for wardens and vestrymen of it. Two of the number then took the box to a retired part of the room, and soon afterwards returned and reported that they had counted the votes in it, and that the defendants, naming them, had been elected wardens and vestrymen of the church, the first-named as the senior, and the second as the junior warden of it. No motion was made or put by any one that the rector should be chairman of the meeting or the presiding officer of the election. The rector had now stepped aside from his position in front of the chair and Mr. Corbitt had for the first time taken his seat in it.

After the voting had ceased, those taking part in it returned to their seats in the church and a lull ensued, of which the chairman, Mr. Corbitt, took advantage to state that the object of the meeting to elect wardens and vestrymen of the church for the year commencing that day, consisting of eight in number, two of whom should be designated as the wardens of it on their tickets, and that an election was then in order, and a member of

State ex rel Dunlap et al *v.* Stewart et al.

the church moved that the meeting proceed to the election which was seconded and adopted, and thereupon on motion a committee of two members was appointed to hold and conduct it in accordance with the usual practice on such occasions. The usual election box of the church was produced and placed on the table, a complete list of the names of the members of the congregation entitled to vote at such election had been carefully prepared for the occasion by the treasurer and secretary of the church, from which, as the names were called out by one of the committee, the voters stepped up in succession to the table and handed one of them their tickets which he deposited in the box, whilst the other member of the committee took down their names on a list of paper as they voted and which, with the tickets voted, was at the close of election carefully enclosed in the box and produced in evidence on the trial of the case in court; and not less than twenty-six of the qualified voters of the congregation who so voted on that day, were present as witnesses at the trial and severally testified that they each voted on that occasion for the relators, respectively naming them for wardens and vestrymen of the church for the current year. Before, however, the voting at this election had entirely closed there were further efforts made by the opposing party by tumult and disorder and by loud noises to stop the progress of it, but finding that was not sufficient for the purpose, one of the two ministers present first attempted to interrupt the proceeding by making a public speech to the meeting, but finding that to fail also, he finally entered the chancel of the church and commenced the morning service while the voting was still going on, but which was at once suspended as soon as it was commenced, and so remained until it was closed by the rector himself, who found it necessary to take the place of the other in consequence of his memory of it having failed him before he had got through with it; those engaged in the election, however, then going on, took no part in the service, but remained entirely quiescent until it was closed, when they resumed the proceedings and soon after peaceably concluded it by ascertaining the number and result of the votes cast, and by formally announcing in accordance therewith that the relators

had been elected wardens and vestrymen of the church for one year from that date.

It was also in evidence before the jury on behalf of the State that it is the usual practice in such churches for the vestry to appoint a committee of the members of them to hold the annual elections of their wardens and vestrymen who are to judge of the qualifications of voters for them; that the members of a parish present at a parish meeting appoint the chairman and other officers of it, and in meetings of the vestry the rector when present is *ex officio* chairman of them, but he is not so in parish meetings, or in annual meetings of the members of the church held for the election of wardens and vestrymen ; and by the constitution and canons of the church no one is entitled to vote at said election who is not a pew or seatholder or renter in the church, or annual subscriber to the support of the minister of it, or an adult male communicant of the same; and by another canon of it, it is made the duty of the vestry to take charge of the property of the church, to regulate all its temporal concerns and to elect and call a minister and to provide for his maintenance, it being understood always that the spiritual concerns of the church are under the exclusive direction of the minister in subordination to the ecclesiastical authority and laws of the diocese. It was also proved that the defendants were, and had been ever since, in possession of the church and the rectory and its property, and are still holding services therein with the rector referred to, and claim to be still the rightful and lawful wardens, vestrymen and legal corporators and trustees of it under the act of Assembly in such case made and provided, and had on demand refused to deliver and surrender the same to the said relators.

*Whitely,* for the defendants, on the closing of the testimony for the State, submitted a motion for a nonsuit on the ground that as the relators and their party had refused to vote in the first election held in the church that day for wardens and vestrymen, and according to their own evidence there were some legal votes, at least, seven legal votes cast in it, it was necessary that

they should have participated in it to have any standing in court in order to contest that election, for by voluntarily abstaining from voting in it, when, as they claim, they had a large majority of the qualified voters with them and might have carried it, and elected their ticket in that election, they voluntarily allowed it to go against them by default.

*The Court,* however, declined to hear the counsel on the other side in reply, and remarked that there was not only evidence enough as far as they had gone on the part of the State to take the case to the jury, but so far it seemed to be nearly all one way, and the court was certainly not prepared now to say by what authority that election was even attempted to be held, to say nothing of the haste and disorder, confusion and illegality with which it was conducted, so far as the evidence now goes. Even if the rector had then been in full connection with the church, we should be at a loss to find by what authority he could assume to hold, as the presiding officer of it, such an election in the parish without the formality even of any election or the expression of any choice of him for the place by the parishioners assembled in the meeting for the purpose of holding such an election. We are willing, however, to hear all the material facts in the case, and any further evidence the defendants may have to disclose in it, and must therefore refuse the motion for a nonsuit.

*Whitely* then proceeded to call, and examined several witnesses for the defendant, without adding anything particularly material to the summary of the testimony already given, and at the conclusion of it stated to the court that he would respectfully decline to address the jury in the case.

*The Court,* Houston, J., charged the jury. The question to be determined by their verdict in the case on the evidence before them is, whether the relators or the defendants, whose names are fully set forth as those of the respective parties on the record of the suit, are now the rightful and lawful wardens and vestry-

State ex rel Dunlap et al *v.* Stewart et al.

men of Christ Church, Delaware city. It is in proof before the jury, and not disputed, that it had, prior to the origin of this contention and dispute, been duly incorporated under our general statutes for the incorporation of religious societies or congregations of Christians in this State, and that statute provides that such societies or congregations may become incorporated by the election of trustees at a public meeting of the society or congregation, held at their usual place of worship, by a plurality of votes of the members present, and taking name and certifying the same under the hands and seals of the trustees to the recorder of deeds of the county, as is more fully and particularly prescribed in the statute. It also expressly provides, with reference to societies or congregations of this particular denomination, that the rector, wardens, and vestrymen of any such church on certifying their name or style, as before mentioned, shall be a corporation, with the franchises, rights, and powers vested by the act in the trustees of other religious societies; and therein and thereby the statute expressly recognizes the fact that they compose, when duly elected, a regular constituted body of officers in such societies or congregations.

The statute, however, does not pretend to prescribe how these wardens and vestrymen are to be elected or appointed to these offices, or by whom they shall be chosen, but leaves the manner of their election and the qualification of voters for them to be prescribed and regulated exclusively by the rules and practice of the church on the subject. And the same may be said with reference to the holding and conducting of the annual elections of them by the qualified members of the congregation present in the annual meeting assembled for that purpose, for that also is to be governed entirely by the established rules and practice of the body, or church, or congregation on the subject. But inasmuch as by the constitution and canons of this church, which have been given in evidence, it appears that the wardens and vestrymen have official charge of all the temporal affairs and concerns of the church or congregation, whilst the rector has the official charge and exclusive direction of the spiritual concerns of it, provided there be one at the time holding that relation to

26

it, we must say to you that, if the unseemly and noisy disturbance and contention which occurred at the annual election of the wardens and vestrymen of the church in question, on Easter Monday, the 18th day of April last, had been, in fact, directly between what is called the "old vestry" and the late rector and his adherents, we could have but little hesitation in determining to which of them, the vestry or the rector, it more appropriately and officially pertained to take in hand the holding of that election, for whilst it was a measure and a proceeding of much importance, it was a temporal affair and concern merely, and would, therefore, have fallen within the sphere of their legitimate official duties instead of his. All the evidence we have in regard to the laws, usage, and practice of the church.in such cases has been introduced on the part of the State, but it has not been contradicted or denied on the other side, and we may, therefore, refer to them as matters of proof in speaking of them as evidence, and from which it also appears that the rector is, *ex officio*, chairman of the vestry meetings, when present, and it is but proper that he should be, as he constituted one of that body and the head of it.

The meeting on this occasion was a general parish meeting of the members of the society or congregation for the annual election of the wardens and vestrymen of it, pursuant to appointment and on the day fixed by the canon of the church for it, and it appears from the evidence, without contradiction or dispute, that at the hour named for it to open, a member of the congregation, but who was neither a warden nor a vestrymen of it, was nominated chairman of the parish meeting assembled and about to be organized preliminary to proceeding with the election, and on his nomination being seconded and put to vote, he was declared by the authority of it to be elected chairman of the meeting. A motion was then made that another member of the society or congregation, but not a warden or vestryman of it, should be the secretary of the meeting, which, being seconded, was submitted by the chairman just elected to the vote of the meeting, and he was thereupon declared by him to be elected secretary of the meeting. The meeting then appointed a com-

State ex rel Dunlap et al *v.* Stewart et al.

mittee of two other members of the congregation to hold the election and receive, count and report the votes of the qualified voters of it in the pending election for wardens and vestrymen in it. Now, this we must say to you was certainly a proper and regular method of proceeding to take the sense of the members assembled, and in organizing the meeting preparatory to opening the election, and in appointing the proper and necessary officers to hold and conduct it, with the sanction and consent, and by the direct action of the meeting itself. And whilst the meeting was thus proceeding in its own legitimate business of opening and conducting its election in an orderly, regular and proper manner, neither the rector nor any other person or persons whatever, could have any authority to interrupt, disturb or arrest it by noise, tumult or confusion, and much less without any formal appointment of persons to hold the election, to seek by rude, indecent and disorderly haste to forestall them in their lawful purpose by rushing through with an election before them in the manner which has been described to the jury. Such a rude and unwarrantable act on the part of the rector in arrogating to himself the right to preside at such a meeting and at such an election without the appointment or sanction of the meeting itself, could confer no claim of right or color of title whatever on such an election as was held that day under his assumed chairmanship and direction of the meeting.

Nor can it constitute any ground of objection to the legal validity and effect of the meeting of the members of the congregation which was organized under its sanction for the purpose of holding the election in a regular, orderly and proper manner, that it was obliged to suspend its preliminary proceedings, and afterwards the progress of their election and voting in it, by reason of the concerted efforts of the other party to interrupt and arrest them, not only by great tumult and disorder in the church, and by the unwarranted and illicit attempt to forestall the majority of the qualified voters in proceeding to the election, but, at last, to interrupt and arrest their voting even by performing the morning service in church during that time because they had the right to suspend any of those proceedings

whenever such interruption rendered it necessary, and then to resume and continue them until the election itself was closed, at any time during that day, as often as the opportunity was afforded them of doing it pending the disturbances. And subject to those interruptions, the election was, in fact, as the evidence shows, incepted, conducted and concluded in a regular, formal and becoming manner; and the result, as well as the character of it, has been disclosed to you in the evidence with but little, if any, conflict of testimony in that respect. And having been first incepted in this lawful and regular manner, it would be contrary to all law, as well as reason, justice and propriety, for us to hold that it could either be superseded or defeated by any trick, artifice, fraud or wrong perpetrated by persons without any authority conferred upon them by the meeting for such a purpose, to suddenly spring an election upon it, and to hurry through it without any of the forms or observances which are indispensably essential to the validity of a bona fide election in such cases.

But even if we were not constrained to take this legal view of the question, the least we could do would be to consider the two as constituting one election, and then the question to be determined by the jury would be, whether the relator or the defendants received a majority of the legal votes cast in the aggregate for the two tickets. As to the legal qualification of a member of the congregation to vote for wardens and vestrymen at their annual election, it must, of course, depend on the law or canon of the church upon that subject, which provides that no person shall be entitled to vote at such election who is not a pew or seat holder or renter, or an annual subscriber to the support of the minister of the church, or a male communicant of the same, and as something was said by counsel on both sides in relation to the matter, we deem it our duty to instruct the jury that the words " annual subscriber," as there employed, imports a person who subscribes an annual sum to the support of the minister of the church, but not one who occasionally or otherwise contributes to his support. He must be an annual subscriber to some amount for that object, or he cannot vote at such

State ex rel Dunlap et al *v.* Stewart et al.

election legally. The evidence in regard to the aggregate votes cast for both tickets and the number of legal votes cast for them respectively is fully before the jury, and from that it would be for them to determine which of the tickets received a majority of all the legal votes cast that day for wardens and vestrymen of the church in question.

We will say in conclusion, however, that if there had been no valid election that day of either the relators, or defendants, in that event the former would continue in office until the next annual election, inasmuch as the constitution and canons of the church provide that the wardens and vestrymen of it shall be elected for a year, and until their successors are elected. If the jury should find in favor of the relators, their verdict should be for the State, otherwise it should be for the defendants.

The State had a verdict.